ESTATE OF WALLACE CASWELL, DECEASED, JENNIE J. CASWELL, ADMINISTRATRIX, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

ESTATE OF CHARLES HENRY CASWELL, DECEASED, EARL W. CASWELL, ADMINISTRATOR, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 27017, 27018. Promulgated January 18, 1952.

*Wareham C. Seaman, Esq.,* for the petitioners.
*Charles W. Nyquist, Esq.,* for the respondent.

OPINION.

TURNER, *Judge:* The proceeding at Docket No. 27017, the Estate of Wallace Caswell, involves a deficiency in income tax for 1945 of $7,828.97, and that at Docket No. 27018, the Estate of Charles Henry Caswell, a deficiency for the same year, of $5,278.10.

The primary issue presented is whether income was realized by the taxpayers in 1945 upon the receipt of certificates issued by a cooperative association upon its commercial reserve fund, and if income was so realized, the question arises as to the fair market value of the certificates at the time they were received by the Caswells. Other issues raised in the pleadings have been adjusted between the parties and effect will be given to the adjustments made under Rule 50.

The facts have been stipulated and are found as stipulated.

Wallace Caswell, until his death on December 3, 1949, and for the years material hereto, was a resident of Ceres, California. He filed his income tax return for the taxable year 1945 with the collector of internal revenue for the first district of California. After his death, his wife, Jennie J. Caswell, was duly appointed and qualified as administratrix for her husband's estate. In the year 1945, Wallace Caswell filed his return on a cash receipts and disbursements basis and reported all income as the community income of himself and wife, to whom he was married at all times material hereto.

Charles Henry Caswell, until his death on June 26, 1949, and for the years material hereto, was a resident of Ceres, California. He filed his income tax return for the taxable year 1945 with the collector of internal revenue for the first district of California. After his death, Earl W. Caswell was duly appointed and qualified as administrator of the estate of Charles Henry Caswell, deceased. In the year 1945, Charles Henry Caswell filed his return on the cash receipts and disbursements basis and reported all income as community income of himself and wife, Helen C. Caswell, to whom he was married at all times material hereto.

Wallace and Charles Henry Caswell each had a one-half interest in the partnership, Caswell Brothers, of Ceres, California. This partnership was engaged in growing peaches which it marketed through the Turlock Cooperative Growers Association of which it was a member.

The Turlock Cooperative Growers Association, sometimes referred to herein as The Co-op, or Turlock, is a California farmers' cooperative marketing association located at Modesto, California. During 1945, and so far as appears during all other years, Turlock was exempt from income tax under section 101 of the Internal Revenue Code.

The Co-op conducted business with its members pursuant to a crop contract. The contract in form was a contract of purchase. It covered all of the crop or crops to be produced for designated years on specified land. "Terms and Conditions" 4, 5, and 6 were as follows:

4. The Association shall pool the commodities of the Grower with commodities of like kind, grade and classification purchased by the Association under contracts similar to this, and the price to be paid to the Grower therefor shall be

based on the average price per pound at which all commodities of like kind, grade and classification shall have been sold by the Association.

5. The Association, if market and financial conditions in its judgment justify, may make advances on account of payment on the commodities purchased by it hereunder, the amount of such advances being based on market and financial conditions and the quality of the commodities.

6. The Association agrees to sell said commodities in bulk in its natural state as delivered, or at its option, to can, preserve, manufacture, process and pack said commodities, or to procure the same to be done, and thereafter sell the same as rapidly as possible and pay the proceeds over to the Grower, named in this and similar contracts, first deducting any advances made the Grower, and each Grower's pro rata share of the cost of receiving, handling, manufacturing, canning, storing, selling, advertising, and other expenses of the Association, and an Association charge, to and in such an amount as shall be determined by the Board of Directors of the Association. From this Association charge, organization and other general Association expenses shall be deducted, and with the balance a commercial reserve shall be created.

Whenever any commercial reserve is no longer needed for Association purposes, the Association shall distribute it among the Growers in the proportions to which they are entitled, determined on the basis of the amount retained from each Grower to create such a reserve.

By section 3 of article XII of Turlock's by-laws it was provided that a nonassignable Certificate of Membership should be issued to "each member" who has signed a marketing agreement in the required form. By section 5 it was provided that each member should have one vote. A membership fee of $10 was payable under section 8 and the fees so paid were to be retained as a membership fund in cash or in specified assets and by section 6 it was provided that the property rights and interest of the members in the membership fund so established should be equal, each member having "one unit of property right and interest." All other rights, interests and participations were to be according to the patronage or participation of the member in the crop marketing program.

The association charge which under provision 6 of the crop contract was to be deducted by the Co-op when making payment to the member for his crop was covered by section 9 of article XII of the by-laws and reads as follows:

From the Association charge provided for in the marketing agreement, organization and other general association expenses shall be deducted and commercial reserves created, and deductions made for the interest on or retirement of the advance fund in the discretion of the Association.

During the taxable year and up to March 8, 1949, the provision of the by-laws covering the creation and maintenance of the commercial reserve also dealt with in provision 6 of the marketing contract was as follows:

The association shall create and maintain a commercial reserve. This reserve shall be deducted from the Association charge and shall be used to purchase nec-

essary equipment and property, to provide working capital and for other uses of the Association, including the purchase of stock of any corporation organized for the purpose among other things of manufacturing or selling the products of this Association, and with whom this Association shall contract for the manufacturing of such products.

Certificates shall be issued bearing interest at the rate of six per cent per annum for and on account of the respective interest herein of the members of the Association. If the members do not elect to continue co-operative marketing to the end of the period provided in the marketing agreement, the directors shall sell the assets of the Association, and after deducting and retaining the entire membership fund for distribution equal to memberships, shall distribute the proceeds proportionately to the owners of the certificates then unredeemed.

During 1945, Turlock issued the partnership, Caswell Brothers, two certificates "for and on account of" its interest in the Commercial Reserve Fund. Certificate 1110 in the amount of $2,731.86 was issued February 1, 1945, and was for the 1943 crop. Certificate 1229 in the amount of $4,389.92 was for the 1944 crop. Up to the date of the trial herein neither certificate had been redeemed. The certificates bore interest at 6 per cent per annum and in form were as follows:

Incorporated March 2, 1929

TURLOCK CO-OPERATIVE GROWERS

An Incorporated Co-operative Association Organized
Under the Laws of the State of California.

THIS CERTIFIES That _____ is the owner of _____ Dollars of the Commercial Reserve Fund of the

TURLOCK CO-OPERATIVE GROWERS

Said Commercial Reserve Fund and the interest therein represented by this

COMMERCIAL RESERVE FUND CERTIFICATE

is subject to the provisions of the Articles of Incorporation and By-Laws of this Association and shall be distributed only in accordance with the provisions thereof.

Interest at the rate of _____ per annum shall be paid upon the face value represented by this certificate from date first issued, until called for redemption.

This certificate is transferable upon the books of the Association by the owner or by duly authorized agent upon surrender of this certificate properly endorsed.

Series _____.　　　Date first issued _____

WITNESS the seal of the Association and the signatures of its duly authorized officers.

Dated _____

_____　　　　_____
　Secretary-Treasurer　　　　　　　　　President

Wallace Caswell, as an individual was also a member of Turlock, and during 1945 three certificates were issued to him reflecting his interest in the Commercial Reserve Fund. Certificate 1111 in the amount of $140.38 and Certificate 1112 in the amount of $789.72 were issued on February 1, 1945, and were for the 1943 crop. Certificate 1230 in the amount of $1,418.82 was issued on November 1, 1945, and was for the 1944 crop. Up to the date of the trial herein none of these certificates had been redeemed. These certificates bore 6 per cent interest per annum and were in the form set out above.

The Co-op operates on the basis of a fiscal year ending January 31. Its balance sheet as of January 31, 1946, was as follows:

*ASSETS*

CURRENT ASSETS:

| | | | |
|---|---|---|---|
| Cash on Hand and in Bank | | | $82,201.38 |
| Accounts Receivable—General | $316,364.26 | | |
| Accounts Receivable—Growers | 9,819.33 | | |
| Subsidy Receivable | 10,469.67 | | |
| Total | 336,653.26 | | |
| Less: Reserve for Bad Debts | 16,828.08 | | |
| | | 319,825.18 | |
| Inventories: | | | |
| Canned Goods—Net Realizable Value | 173,596.12 | | |
| Materials and Supplies | 191,085.16 | | |
| | | 364,681.28 | |
| Total Current Assets | | | $766,707.84 |

PREPAID EXPENSES:

| | | |
|---|---|---|
| Taxes and Insurance | $16,576.39 | |
| Plant Reconditioning | 48,617.30 | |
| Sundry Prepaid Expenses | 2,867.95 | |
| Total Prepaid Expenses | | 68,061.6 |

| FIXED ASSETS: | Cost | Reserve for Depreciaton | Net Book Value | |
|---|---|---|---|---|
| Land | $9,500.00 | | $9,500.00 | |
| Buildings | 253,212.46 | $41,232.22 | 211,980.24 | |
| Machinery & Equipment | 324,023.89 | 134,750.73 | 189,273.16 | |
| Autos and Trucks | 18,095.20 | 13,843.56 | 4,251.64 | |
| Furniture and Fixtures | 5,633.51 | 4,023.07 | 1,610.44 | |
| Lub Boxes and Crates | 61,852.41 | 35,261.55 | 26,590.86 | |
| Field and Orchard Equipment | 5,524.55 | 2,544.71 | 2,979.84 | |
| Total Fixed Assets | 677,842.02 | 231,655.84 | 446,186.18 | 446,186.18 |

OTHER ASSETS:

| | | |
|---|---|---|
| Stock in Berkeley Bank for Cooperatives | $12,100.00 | |
| Investment—Central Cooperative, Inc. | 750.95 | |
| Trade Marks | 330.00 | |
| Investment—Canners Service, Inc. | 10,000.00 | |
| Advances to Fruit Machinery | 13,500.00 | |
| Total Other Assets | | 36,680.95 |
| Total Assets | | $1,317,636.61 |

## LIABILITIES AND MEMBERS' EQUITIES

CURRENT LIABILITIES:

| | | |
|---|---:|---:|
| Notes Payable—Berkeley Bank for Cooperatives | | $181,915.27 |
| Current Installment—Facility Loan | | 15,000.00 |
| Contracts Payable | | 5,738.00 |
| Accounts Payable—Trade | | 66,011.33 |
| Accounts Payable—Brokers | | 13,829.23 |
| Amount due on Sales and Management Contract | | 4,832.61 |
| Called Certificates—Not Paid | | 980.78 |
| Sundry Accruals: | | |
| Provision to Ship Goods Billed | $28,269.37 | |
| Payroll | 1,878.51 | |
| Interest | 16,581.04 | |
| Payroll Taxes | 1,980.85 | |
| Sundry Accruals | 617.65 | |
| | | 49,327.42 |
| Total Current Liabilities | | $337,634.64 |

DUE GROWERS:

| | | |
|---|---:|---:|
| Total Pool Proceeds—Tentative—Exhibit "O" | | $769,191.79 |
| Less: | | |
| Advances to January 31, 1946 | $417,869.89 | |
| Retains (Tentative) 10% of Proceeds | 76,919.18 | 494,789.07 |
| Balance due Growers | | $274,402.72 |
| Facility Loan—Berkeley Bank for Cooperatives | 150,000.00 | |
| Less: Current Installment shown above | 15,000.00 | |
| | | 135,000.00 |

MEMBERS' EQUITY ACCOUNTS:

| | | |
|---|---:|---:|
| Membership Fees | 760.00 | |
| Retains—1944 and Prior Pools (Schedule "A-1") | 492,920.07 | |
| Retains—1945 Pools (10% of Net Proceeds—Tentative) | 76,919.18 | |
| Total Members' Equity Accounts | | 570,599.25 |
| Total Liabilities and Members' Equities | | $1,317,636.61 |

Turlock renders a financial statement to each of its members at the end of each of its fiscal years but the statement given to members is not broken down into details to the extent shown above.

During a crop year but before harvesting, the Co-op makes advances to its members. When the crop is harvested and delivered to it, the Co-op pays its members in cash as it in turn sells the crop or goods canned from the crop, after deducting for the advances made, less a percentage, usually at 10 per cent, which is withheld by the Co-op and which ultimately is represented by the issuance of certificates. Upon receipt by the Co-op, the crop produced by a member is mixed with similar crops produced by other members and becomes part of one of the pools for that year. As these pools are liquidated by the Co-op, the above-mentioned payments are made. After a pool is liquidated to the extent of 90 per cent or 95 per cent, the pool is closed and certificates are issued for the amounts withheld plus an estimated 10 per cent of the sales price on the remaining 5 per cent or 10 per cent of the pool unsold at the time of its closing. This unsold portion of the pool is carried over to following years and sold without burden of any further

expense, the actual expenses of sale being carried entirely by the current year pools.

At the conclusion of the distribution of each commodity pool, a statement is rendered to each of the growers showing the total amount received for the commodity marketed, less any charges that might have been made to him, also less the Reserve Fund Certificate which up to this time had been issued on the basis of 10 per cent of the net return of the commodity marketed.

The Co-op, from time to time, purchases certain quantities of raw materials from non-members in order to complete pack orders with respect to certain commodities, but the quantities so purchased are small in comparison to the materials supplied by the grower members.

If the financial condition of the Co-op is such that the board of directors concludes that a redemption can be made of outstanding certificates, a call is made for the oldest outstanding certificates. Prior to the amendment of article XIII of the association's by-laws in 1949, certificates were issued and redeemed on the basis of their individual dates of issuance; the amendment requires that they now be issued and redeemed in yearly series. For all times material hereto the Co-op has paid those certificates which it redeemed on the basis of 100 cents on the dollar. In 1941 the Co-op redeemed the certificates which it issued in 1935 and 1936, and a portion of those issued in 1937. In 1943 it redeemed the remainder of the certificates issued in 1937 and also those issued in 1938 and a portion of those issued in 1939. In 1944 it redeemed the remainder of the certificates issued in 1939 and all of those issued in 1940. In 1945 no certificates were redeemed. In 1946 the Co-op redeemed the certificates issued during the first eight months of 1941. In 1947 it redeemed the remainder of the certificates issued in 1941 and all of those issued in 1942. In 1948 it redeemed certificates issued during the first five months of 1943. No certificates have been redeemed since 1948.

According to the books of Turlock six transfers of certificates were made in 1944 and thirteen in 1945. The circumstances, reasons or considerations for these transfers are not shown of record and do not appear on the books of the Co-op.

Interest rates on the certificates are now fixed by the board of directors of the Co-op. Certificates issued currently carry interest at 3 per cent, whereas earlier certificates, including those for the year 1945, carried an interest rate of 6 per cent.

All of the assets of Wallace Caswell and Charles Henry Caswell were inherited by them from their father, prior to 1945, or were the proceeds of rents, profits or increments from such assets. Their interest in Caswell Brothers, a partnership, produced distributive income to each of them in 1945 in the amount of $14,870.79 which included

their interest in the issuance of Turlock Growers Association Certificates in the amount of $7,121.78 during that year. Personal services were also rendered by them in the production of said income. Another asset, their interest in the partnership of W. & C. H. Caswell produced distributive income to each of them in 1945 in the amount of $1,091.57, and to the production of such income they contributed personal services. Wallace Caswell and Charles Henry Caswell were members of a partnership, Caswell Manufacturing Company of Cherokee, Iowa, to which they rendered no personal services, and in 1945 they each had distributive income in the amount of $10,000 from said partnership which was separate, as distinguished from community income. During the year 1945, Wallace Caswell also received as income, the amount of $7,598.17 from the operation of a farm to which he contributed personal services, and Charles Henry Caswell received income in the amount of $1,975.91 from the operation of a farm to which he contributed personal services. All of said personal services were in the conduct of farming operations.

The fair market value of the certificates issued by Turlock in 1945 on its Commercial Reserve Fund to Wallace Caswell and to the partnership, Caswell Brothers, was equal to the face value of the respective certificates.

In his determination of the deficiencies herein the respondent included in gross income the face amount of the certificates issued in the taxable year. In his notices of deficiency the amounts so included in gross income were shown as representing the fair market value of the said certificates.

The argument of the petitioners is twofold, the first contention being that since they reported their income on the cash basis and since at no time during the taxable year did they actually receive or become unqualifiedly entitled to receive payment of the moneys in the commercial reserve covered by the certificates issued, they did not constructively, or otherwise, receive or realize income by reason of their receipt of the certificates. Their second contention is that in any event the certificates had no fair market value when issued and accordingly there was upon their receipt no realization of gain under section 111 (b) of the Internal Revenue Code [1] as determined and claimed by the respondent.

As to the argument on constructive receipt, it is to be noted that there are statements in some of the decided cases which may well be

---

[1] SEC. 111. DETERMINATION OF AMOUNT OF, AND RECOGNITION OF, GAIN OR LOSS.

   *      *      *      *      *      *      *

  (b) AMOUNT REALIZED.—The amount realized from the sale or other disposition of property shall be the sum of any money received plus the fair market value of the property (other than money) received.

regarded as authority for the proposition that moneys carried to capital reserves by cooperative associations under comparable terms and conditions have already been constructively received by the members of the Co-op since it is said that such funds in reality belong to the members and not the Co-op. *San Joaquin Valley Poultry Producers Association* v. *Commissioner*, 136 F. 2d 382; *Colony Farms Cooperative Dairy, Inc.*, 17 T. C. 688; *George Bradshaw*, 14 T. C. 162; and *Harbor Plywood Corporation*, 14 T. C. 158. And, there might even be stronger reasons for applying such a rule in this case since for 1945, at least, Turlock was exempt from income tax under section 101 of the Internal Revenue Code, whereas some, if not all, of the co-ops involved in the cases cited were not exempt. In *Dr. P. Phillips Cooperative*, 17 T. C. 1002, however, a cooperative which was subject to tax, we declined to extend the conduit theory to cover the moneys carried into a reserve where it was not shown that the certificates issued against the reserve were issued "pursuant to a pre-existing obligation or liability," and in *George Bradshaw, supra*, after acknowledging the conduit doctrine, we held that it was the issuance of the notes by the Co-op which fixed the rights of the patrons in the moneys covered thereby and not the closing by the Co-op of the transactions from which the moneys in question were derived.

In the instant cases the respondent does not rely on the conduit theory nor on any other variation of the theory of constructive receipt but has determined and contends that the Caswells in payment for their peaches, and in addition to the cash distributed, received other property, namely, the certificates, and under section 111 (b) *supra*, received and realized income to the extent of the fair market value of the certificates at the time of issue, and further that the fair market value of the certificates was equal to face. It is thus apparent that no issue has been joined here involving any question of constructive receipt of the moneys in the commercial reserve.

The decision, in our opinion, must be for the respondent. Whether the certificates received be likened to debentures or evidences of indebtedness or to shares of preferred stock or be said to evidence a more direct ownership of the designated amount of the commercial reserve, they were none the less securities evidencing valuable rights or interest in the commercial reserve which belonged to the Caswells and which without restriction, other than that the transfers thereof be recorded on Turlock's books, could be sold, traded in or assigned and not only could such certificates be assigned and transferred but the record indicates that transfers thereof were usual and customary, six of such transfers having been recorded in 1944 and thirteen during 1945, the taxable year herein. And, while they had no specified due date or dates they bore interest at 6 per cent per annum on the face amount and there is no showing or claim that the interest was not

regularly paid when due. Furthermore, the record also indicates a practice on the part of Turlock of retiring or redeeming outstanding certificates at face before too many years had elapsed. Presumably, subsequent additions to the commercial reserve from the proceeds of later crop pools would adequately provide for the capital needs of the association and thereby permit the prior certificates to be retired or redeemed. It is our opinion, and we conclude, that the certificates meet the requirements of section 111 (b), *supra*, and that they represented income to the petitioners at the time of issue to the extent of their fair market value.

As to the fair market value the decision also must be for the respondent. The petitioners rest their claim of no fair market value on three things (1) that the certificates had no specified due date, (2) that although assignable, they were not negotiable instruments, and (3) that two local bankers, if called as witnesses, would have testified that from a banking standpoint the certificates were not classified as marketable, that their purchase would have been on a speculative basis and in instances where they were accepted as collateral for loans they were accepted as "additional collateral" only.

To the contrary, Turlock's balance sheet gives every indication that the value back of the certificates covered them at face. The interest provided was at a very attractive rate. There was no indication that Turlock had ever defaulted on interest payments and it has an apparent record of redemption of such certificates without undue delay. Furthermore, in light of the transfers of certificates recorded on Turlock's books in 1944 and 1945, we think it reasonable to assume that the certificates were traded and exchanged even though the consideration or occasion for the transfers recorded is not shown. It is shown also that Turlock was known in the community as being in sound condition and well managed. In such circumstances we think it clear that the certificates from the date of their issuance not only had fair market value but the record gives no leeway for saying that such fair market value was less than face. See and compare *George Bradshaw*, *supra*, and *P. Phillips*, 17 T. C. 1027.

*Decisions will be entered under Rule 50.*