**CASWELL'S ESTATE**

v.

**COMMISSIONER OF INTERNAL REVENUE (two cases).**

**No. 13523.**

United States Court of Appeals
Ninth Circuit.

April 1, 1954.

Seaman & Dick, Wareham C. Seaman, Stockton, Cal., for petitioners.

H. Brian Holland, Asst. Atty. Gen., Meyer Rothwacks, Ellis N. Slack, A. F. Prescott, William L. Norton, Jr., Sp. Assts. to Atty. Gen., Charles W. Davis, Chief Counsel, Bureau of Internal Revenue, Washington, D. C., for respondents.

Before MATHEWS, STEPHENS and BONE, Circuit Judges.

MATHEWS, Circuit Judge.

Wallace Caswell and Charles Henry Caswell, residents of Stanislaus County, California, died in 1949. Thereafter respondent, the Commissioner of Internal Revenue, determined that there was a deficiency of $7,828.97 in respect of Wallace Caswell's income tax for 1945, and that there was a deficiency of $5,278.10 in respect of Charles Henry Caswell's income tax for 1945. Petitioners, the estates of the Caswells, petitioned the Tax Court for redeterminations of their income tax liabilities for 1945. The Tax Court, after a hearing, entered decisions (17 T.C. 1190) sustaining respondent's determinations. Contending that the deficiency in respect of Wallace Caswell's income tax for 1945 was less than $7,828.97, and that the deficiency in respect of Charles Henry Caswell's income

tax for 1945 was less than $5,278.10,[1] petitioners seek review of the decisions.[2]

The Caswells constituted, and were members of, a partnership called Caswell Brothers, wherein each had a one-half interest. Wallace Caswell and the partnership were growers of peaches and were members of Turlock Co-operative Growers, a co-operative association incorporated under the laws of California,[3] hereafter called the Association.[4] In 1943 and 1944, Wallace Caswell and the partnership sold and delivered peaches to the Association pursuant to crop contracts, each of which was in the following form:

"This agreement, made this —— day of ———, 19——, between the [Association] and ———, hereinafter called the Grower,[5] witnesseth:

"That the Association does hereby purchase and the Grower does hereby sell all of the crop or crops (hereinafter referred to as commodities) listed below to be produced during the years ——— on the following described land in Stanislaus County, California, to-wit:———

_____

_____

"Crops by commodities:[6] ———

_____

"At and for the prices net to the Grower determined as hereinafter set forth. The terms and conditions printed on the back hereof are a part of this contract.

"In witness whereof, the parties hereto have executed this contract in duplicate the day and year first above written."

The terms and conditions printed on the back of each contract[7] included the following:

"4. The Association shall pool the commodities of the Grower with commodities of like kind, grade and classification purchased by the Association under contracts similar to this, and the price to be paid to the Grower therefor shall be based on the average price per pound at which all commodities of like kind, grade and classification shall have been sold by the Association.

"5. The Association, if market and financial conditions in its judgment justify, may make advances on account of payment on the commodities purchased by it hereunder, the amount of such advances being based on market and financial conditions and the quality of the commodities.

"6. The Association agrees to sell said commodities in bulk in its natural state as delivered, or at its option, to can, preserve, manufacture, process and pack said commodities, or to procure the same to be done, and thereafter sell the same

1. That there was a deficiency in respect of each of these taxes is not disputed here.

2. The record filed here on August 29, 1952, contains both petitions for redetermination, both answers thereto and both petitions for review. The "transcript of record" filed here on February 3, 1953, contains the petition of Wallace Caswell's estate for redetermination, the answer thereto and the petition of Wallace Caswell's estate for review, but does not contain the petition of Charles Henry Caswell's estate for redetermination, the answer thereto or the petition of Charles Henry Caswell's estate for review.

3. See §§ 1191–1220 of the California Agricultural Code.

4. It was stipulated that the Association was "a farmers' co-operative exempt under [26 U.S.C.A.Int.Rev.Code, § 101]," meaning, we suppose, that the Association was one of those exempted from income taxation by subsection (12) of § 101, as it existed in 1945. See 52 Stat. 480.

5. In contracts to which Wallace Caswell was a party, he was named as "the Grower." In contracts to which the partnership was a party, it was named as "the Grower."

6. In contracts to which Wallace Caswell or the partnership was a party, the listed "commodities" were peaches.

7. The record filed here on August 29, 1952, contains a copy of these terms and conditions. The "transcript of record" filed here on February 3, 1953, does not.

as rapidly as possible and pay the proceeds over to the Grower, named in this and similar contracts, first deducting any advances made the Grower, and each Grower's pro rata share of the cost of receiving, handling, manufacturing, canning, storing, selling, advertising, and other expenses of the Association, and an Association charge, to and in such an amount as shall be determined by the board of directors of the Association. From this Association charge, organization and other general Association expenses shall be deducted, and with the balance a commercial reserve shall be created. Whenever any commercial reserve is no longer needed for Association purposes, the Association shall distribute it among the Growers in the proportions to which they are entitled, determined on the basis of the amount retained from each Grower to create such a reserve."

The peaches sold and delivered by Wallace Caswell and the partnership to the Association in 1943 and 1944 were pooled with others as provided in paragraph 4, supra, and were handled and disposed of by the Association as provided in paragraph 6, supra, and the proceeds thereof, less the deductions mentioned in paragraph 6, were paid to Wallace Caswell and the partnership. The deductions included an Association charge which included amounts retained by the Association to create a commercial reserve as

provided in paragraph 6. Amounts so retained from the proceeds of peaches sold and delivered by Wallace Caswell to the Association in 1943 and 1944 aggregated $2,348.92. Amounts so retained from the proceeds of peaches sold and delivered by the partnership to the Association in 1943 and 1944 aggregated $7,121.78.

In 1945, the Association issued to Wallace Caswell three commercial reserve fund certificates (Nos. 1111, 1112 and 1230) in the aggregate principal amount of $2,348.92 [8] and issued to the partnership two commercial reserve fund certificates (Nos. 1110 and 1229) in the aggregate principal amount of $7,121.-78.[9] These certificates represented the amounts which, to create a commercial reserve, the Association had retained from the proceeds of peaches sold and delivered by Wallace Caswell and the partnership to the Association in 1943 and 1944. Each certificate was in the following form:

"This certifies that ———— is the owner of ———— Dollars of the commercial reserve fund of the [Association].

"Said commercial reserve fund and the interest therein represented by this commercial reserve fund certificate is subject to the provisions of the articles of incorporation and by-laws of this Association [10] and shall be distributed only

---

8. No 1111 was in the principal amount of $140.38. No. 1112 was in the principal amount of $789.72. No. 1230 was in the principal amount of $1,418.82.

9. No. 1110 was in the principal amount of $2,731.86. No. 1229 was in the principal amount of $4,389.92.

10. The Association's articles of incorporation did not mention or refer to any commercial reserve or commercial reserve fund or commercial reserve fund certificate. The Association's by-laws provided: "Every person shall pay the Association upon entering the Association a membership fee of $10.00. The Association shall create a membership fund out of the entrance or membership fee of $10.00 per member. * * * The Association shall create and maintain a commercial reserve. This reserve shall be deducted from the Association charge

and shall be used to purchase necessary equipment and property, to provide working capital and for other uses of the Association, including the purchase of stock of any corporation organized for the purpose among other things of manufacturing or selling the products of this Association, and with whom this Association shall contract for the manufacturing of such products. Certificates shall be issued bearing interest at the rate of six per cent per annum for and on account of the respective interest herein of the members of the Association. If the members do not elect to continue co-operative marketing to the end of the period provided in the marketing agreement [a general marketing agreement elsewhere described in the by-laws], the directors [of the Association] shall sell the assets of the Association, and after deducting and retaining the en-

in accordance with the provisions thereof.

"Interest at the rate of six per cent per annum shall be paid upon the face value represented by this certificate [11] from date first issued, until called for redemption.

"This certificate is transferable upon the books of the Association by the owner or by duly authorized agent upon surrender of this certificate properly endorsed."

The following form of endorsement [12] was printed on the back of each certificate:

"For value received ——— hereby sell, assign and transfer unto ——— the interest in the commercial reserve fund represented by the within certificate [No. ———] and do hereby irrevocably constitute and appoint ——— attorney to transfer the said interest on the books of the within named Association, with full power of substitution in the premises."

The Tax Court held that the certificates issued to Wallace Caswell in 1945 constituted income of Wallace Caswell for 1945 to the extent of the amounts mentioned therein (amounts aggregating $2,348.92), and that the certificates issued to the partnership in 1945 constituted income of the partners (Wallace Caswell and Charles Henry Caswell) for 1945 to the extent of the amounts mentioned therein (amounts aggregating $7,121.78). Petitioners contend, and we agree, that these holdings were erroneous.

The certificates issued to Wallace Caswell and the partnership in 1945 were mere evidences of their contingent rights in and to the commercial reserve fund mentioned above—rights which existed prior to 1945 under and by virtue of the Association's by-laws [13] and the crop contracts mentioned above.[14] The certificates did not give to Wallace Caswell or to the partnership or to the partners any new right or any greater right than they had before the certificates were issued. Under the by-laws and the contracts mentioned above, distributions were to be made to Wallace Caswell and the partnership from the Association's commercial reserve fund upon the happening of certain contingencies—termination of the Association's need for any commercial reserve,[15] discontinuance of co-operative marketing by the Association's members and sale of the Association's assets by its directors.[16] These contingencies never happened. Consequently no distribution was ever made to Wallace Caswell or to the partnership or to the partners or either of them. None of the certificates issued to Wallace Caswell or to the partnership in 1945 was ever sold, assigned, transferred or disposed of by Wallace Caswell or by the partnership or by the partners or either of them, nor did Wallace Caswell or the partnership or the partners or either of them ever receive anything for or on account of any of the certificates. Therefore none of the certificates issued to Wallace Caswell in 1945 constituted income of Wallace Caswell for 1945 to any extent whatever, nor did any of the certificates issued to the partnership in 1945 constitute income of the partners or either of them for 1945 to any extent whatever.[17]

---

tire membership fund for distribution equal to memberships, shall contribute the proceeds proportionately to the owners of the certificates then unredeemed."

11. See footnote 10. The legal rate of interest in California is 7% per annum. General Laws of California, Act 3757, § 1.

12. The record filed here on August 29, 1952, contains a copy of this form. The "transcript of record" filed here on February 3, 1953, does not.

13. See footnote 10.

14. See paragraph 6 of the contracts, supra.

15. See paragraph 6 of the contracts, supra.

16. See footnote 10.

17. See Eisner v. Macomber, 252 U.S. 189, 40 S.Ct. 189, 64 L.Ed. 521; Miles v. Safe Deposit & Trust Co., 259 U.S. 247, 42 S.Ct. 483, 66 L.Ed. 923; Weiss v. Stearn, 265 U.S. 242, 44 S.Ct. 490, 68 L.Ed.

The Tax Court should recompute the Caswells' incomes for 1945, excluding the $2,348.92 and the $7,121.78 mentioned above, and should thereupon redetermine the Caswells' income tax liabilities for 1945 and the deficiencies in respect thereof.[18]

Reversed and remanded for further proceedings in conformity with this opinion.

1001; Helvering v. Griffiths, 318 U.S. 371, 63 S.Ct. 636, 87 L.Ed. 843; United National Corp. v. Commissioner, 9 Cir., 143 F.2d 580; Bedell v. Commissioner, 2 Cir., 30 F.2d 622; Decatur Water Supply Co. v. Commissioner, 7 Cir., 88 F.2d 341; Schlemmer v. United States, 2 Cir., 94 F.2d 77; Tourtelot v. Commissioner, 7 Cir., 189 F.2d 167; Wiegand v. Commissioner, 3 Cir., 194 F.2d 479.

18. See footnote 1.