*Decisions will be entered under Rule 50.*

RIVERFRONT GROVES, INC., PETITIONER *v*. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 1378–72. Filed June 18, 1973.

*James E. Miller*, for the petitioner.
*Kenneth B. Wheeler*, for the respondent.

FAY, *Judge:* Respondent determined deficiencies in the Federal income tax of petitioner as follows:

| *TYE July 31—* | *Deficiency* |
| --- | --- |
| 1968 | $10, 335. 62 |
| 1969 | 10, 529. 37 |
| 1970 | 14, 795. 90 |

The issue for consideration is whether petitioner should take the face amount of qualified per-unit retain certificates into income as it has consented to do pursuant to the provisions of section 1388(h).[1]

### FINDINGS OF FACT

Some of the facts have been stipulated. The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference.

The petitioner, Riverfront Groves, Inc. (Riverfront); is a corporation duly organized and existing under the laws of the State of Florida. At the time of the filing of the petition herein, the principal office of petitioner was located in Vero Beach, Fla. Petitioner's corporate income tax returns for the taxable years ended July 31, 1968, 1969, and

[1] All section references are to the Internal Revenue Code of 1954, unless otherwise indicated.

1970, were filed with the office of the director, Southeast Internal Revenue Service Center, Chamblee, Ga.

Riverfront is engaged primarily in the business of harvesting and packing citrus fruit. Petitioner, for a fee, performs services for and on behalf of a number of citrus grove owners (the growers) in the Indian River, Fla., area, assisting them in harvesting, packing, and marketing their fruit.

In the case of fruit harvested by Riverfront which is unsuitable for packing, petitioner has another means of marketing such. That fruit is harvested and processed into canned and frozen concentrated citrus juices, citrus essential oils, citrus feed, and molasses. Plymouth Citrus Products Cooperative (Plymouth or the cooperative) is the recipient and processor of this unsuitable-for-packing fruit.

Plymouth is a cooperative organization as described by section 1381(a). Petitioner is a stockholder in Plymouth and was a member-patron of Plymouth during the years at issue. During the years at issue, when petitioner shipped fruit to Plymouth, which it harvested for its grower-customers, petitioner was responsible for any loss which occurred to the fruit during the time of shipment. When the fruit was received by Plymouth it made no effort to separate or allocate the fruit as being the property of anyone other than petitioner. No agreement exists between petitioner and Plymouth that petitioner is acting as an agent for the individual growers serviced by petitioner. Plymouth paid for the fruit it received with an initial advance to petitioner on delivery, and then from time to time as the product was sold, Plymouth made further remittances to Riverfront.

The amount of money received by petitioner from Plymouth was directly proportional to the amount of fruit petitioner shipped to Plymouth. In addition to the money received for the processed fruit, petitioner received from Plymouth per-unit retain certificates (certificates), the face amount of which was computed on the basis of the amount of fruit marketed for petitioner. The amounts represented by these certificates represent payment which would otherwise be a further remittance to petitioner; however, the actual amounts were retained by the cooperative as part of an established base capital requirement plan. Pursuant to this plan, the board of directors of Plymouth determined what the cooperative's capital requirement was. This capital requirement was translated into a per-box-of-fruit figure that would result in the receipt of the necessary working capital as determined. The certificates represented 10 cents per box on each box of fruit placed with Plymouth during the years at issue. The per-unit retain certificates issued by the cooperative to Riverfront recognized petitioner's growing equity interest in the cooperative which resulted from the cooperative's retention of the additional earnings in its capital fund.

Petitioner received revolving fund (per-unit retain) certificates issued by Plymouth in the following amounts:

| TYE July 31— | Certificate No. | Amount |
|---|---|---|
| 1968 | 3306 | $20, 348. 30 |
| 1969 | 3374 | 19, 942. 00 |
| 1970 | 3420 | 28, 897. 00 |

These per-unit retain certificates have no fair market value outside of the citrus industry. They cannot be utilized as security for normal, commercial, or banking transactions, or loans, and they are redeemable by the issuing cooperative solely at the discretion of the board of directors. Petitioner has never received any cash payments from Plymouth in redemption of the certificates. In fact, redemptions of similar certificates have not been made by the cooperative for at least 10 years.

Over and above this potential right to eventual redemption, the certificates represent to the member-patron holding such a certain equity interest in the cooperative which entitles him to particular privileges, for some of which privileges a nonmember would have to pay. Specifically, in the present case, because of the per-unit retain certificates held by petitioner, petitioner is entitled to have 100,000 boxes of fruit processed by the cooperative without paying a processing charge. In addition, while the need has never arisen, the cooperative, if necessary, would show a preference to member-patrons if there were only limited facilities available for all of the cooperative's customers.

A customer of the cooperative need not participate as a member-patron in order to process its goods through the cooperative. A non-member-patron doing business with Plymouth does not receive any per-unit retain certificates but, instead, is required by contract to pay a per-box processing charge for the use of Plymouth's processing facilities. Petitioner is no longer a member-patron of Plymouth and no longer receives per-unit retain certificates.

In order to participate as a member-patron and therefore avoid being subject to the per-box processing fee charged to nonmembers, the member-patron must consent to include the per-unit retain certificates received into income at their face value.

On November 18, 1966, and August 23, 1968, petitioner, by its president, executed written agreements with Plymouth relating to its income allocations and per-unit retain certificates issued by it.

The consent agreements signed by petitioner conform with section 1388(h)(2)(A) as proper expressions of agreement by the distributee of per-unit retain certificates to take the certificate into account at its stated dollar amount as provided in section 1385(a).

Business dealings in the citrus industry, insofar as they relate to Riverfront and the growers it serviced, are very informal. There are no written contractual agreements governing the parties' dealings. If Riverfront is in a position to service a grower it will do so, and

after taking out its fee Riverfront remits all the remaining proceeds to the grower whose fruit it has harvested and marketed.

Riverfront keeps its books on a cash basis except that at the end of each tax year it makes certain adjusting and closing entries accruing liabilities to its grower-clients for their fruit. However, for the years at issue the adjusting and closing entries did not reflect liabilities to the grower-clients for per-unit retain certificates received by petitioner from Plymouth. While Riverfront made some attempt to segregate the per-unit retain certificates attributable to each grower on its own ledger, it never informed the growers of the existence of those retain certificates or of their potential rights, if any, to the certificates. In fact, petitioner's grower-clients did not receive notice of and were for the most part ignorant of the fact that petitioner was receiving qualified per-unit retain certificates from Plymouth. Some growers did not even know through which facilities their fruit was processed. The yearly statements which petitioner sent to its grower-clients did not refer to or contain any information whatsoever regarding the per-unit retain certificates received by petitioner from Plymouth. Furthermore, petitioner's directors never adopted any formal indicia of an obligation to pass the retain certificates or any benefits accruing from such on to the growers.

On its Federal income tax returns for the taxable years ending July 31, 1968, 1969, and 1970, petitioner failed to include any of the face amount of the qualified per-unit retain certificates in income. Respondent in his notice of deficiency increased petitioner's taxable income to reflect the inclusion of the full face amounts of those certificates.

OPINION

A nonmember-customer of the Plymouth cooperative in the present case must pay a processing fee for the services rendered him by the cooperative. A member-patron is not assessed such a fee but is required to consent to include in income 10 cents per box for fruit handled by the cooperative. Instead of receiving the actual 10 cents which it consents to include in income, it receives a noncash dividend known as a per-unit retain certificate which is representative of its equity interest in the cooperative. This procedure enables the cooperative to retain the 10 cents per box for its own capital expansion program while at the same time it benefits from a patronage dividend-paid deduction on the distribution of the certificates. The cooperative views the transaction as if it has constructively distributed the cash which has then been reinvested by the patron in the nature of a capital contribution. A member-patron of the cooperative, because of its member status, has the right to receive whatever payments may be forthcoming in the future in redemption of its per-unit retain certificates. It is also entitled to market a certain number of boxes of fruit for free; the number

of boxes is, of course, dependent upon the amount of per-unit retain certificates a patron-member holds. Furthermore, the cooperative is prepared to extend preferred service to its members if the demand for its facilities exceeds supply.

The issue for decision is whether petitioner must include in gross income, pursuant to section 1385(a),[2] the face amounts of qualified per-unit retain certificates issued to it by Plymouth pursuant to section 1382(b)[3] which it consented to include in gross income under section 1388(h).[4]

Petitioner's contentions, all of which we reject, are as follows:

(1) The per-unit retain certificates have absolutely no value to petitioner. They instead represent income to the cooperative and any attempt to tax petitioner on this income is in violation of petitioner's rights under the 16th, 5th, and 13th amendments of the United States Constitution.

(2) Assuming the per-unit retain certificates do represent income which cannot be attributed to the cooperative, petitioner contends that the income is properly taxable to the growers whose fruit was processed by the cooperative. Petitioner argues that it was merely an agent for the growers, that any gain generated through use of the cooperative passed to the growers, and petitioner as a conduit exercising mere dominion over this gain is not taxable on such. See *Seven-Up Co.*, 14 T.C. 965 (1950) ; *Robert M. Brittingham*, 57 T.C. 91 (1971).

The first argument to dispense with is petitioner's claim that in taxing it on income which is really attributable to Plymouth or the growers, the Commissioner is compelling it to labor against its will

---

[2] SEC. 1385. AMOUNTS INCLUDIBLE IN PATRON'S GROSS INCOME.

(a) GENERAL RULE.—Except as otherwise provided in subsection (b), each person shall include in gross income—

\*　　\*　　\*　　\*　　\*　　\*　　\*

(3) the amount of any per-unit retain allocation which is paid in qualified per-unit retain certificates and which is received by him during the taxable year from an organization described in section 1381(a).

[3] SEC. 1382. TAXABLE INCOME OF COOPERATIVES.

(b) PATRONAGE DIVIDENDS AND PER-UNIT RETAIN ALLOCATION.—In determining the taxable income of an organization to which this part applies, there shall not be taken into account amounts paid during the payment period for the taxable year—

\*　　\*　　\*　　\*　　\*　　\*　　\*

(3) as per-unit retain allocation (as defined in section 1388(f)), to the extent paid in money, qualified per-unit retain certificates (as defined in section 1388(h)), or other property (except nonqualified per-unit retain certificates, as defined in section 1388(i)) with respect to marketing occurring during such taxable year ; or

[4] SEC. 1388. DEFINITIONS ; SPECIAL RULES.

(h) QUALIFIED PER-UNIT RETAIN CERTIFICATE.—

\*　　\*　　\*　　\*　　\*　　\*　　\*

(2) MANNER OF OBTAINING AGREEMENT.—A distributee shall agree to take a per-unit retain certificate into account as provided in paragraph (1) only by—

(A) making such agreement in writing, or

(B) obtaining or retaining membership in the organization after—

(i) such organization has adopted (after the date of the enactment of this subsection) a bylaw providing that membership in the organization constitutes such agreement, and

(ii) he has received a written notification and copy of such bylaw.

for the benefit of others and this is the essence of involuntary servitude as precluded by the 13th amendment.

This argument is without merit.

If the requirements of the tax laws were to be classed as servitude, they would not be the kind of involuntary servitude referred to in the Thirteenth Amendment. [*Porth* v. *Brodrick*, 214 F. 2d 925, 926 (C.A. 10, 1954).]

See also *John W. Crowe*, T.C. Memo. 1967–166, affirmed per curiam 396 F. 2d 766 (C.A. 8, 1968).

.An answer to petitioner's next argument which makes reference to the abridgment of its rights under the 16th and 5th amendments requires a brief review of the history of the taxation of cooperatives and their patrons.

Prior to legislation enacted in 1951 there were numerous cases and administrative rulings which recognized the rights of nonexempt cooperatives to exclude patronage dividends from gross income.

[This] exclusion of patronage dividends for federal income tax purposes [was] not placed upon the ground that cooperatives are special creatures of statute under the tax laws, but [was] justified * * * upon the theory that patronage dividends [were] in reality * * * deferred payments on sales * * * allocated or distributed pursuant to a pre-existing obligation of the cooperative and thus [did] not constitute taxable income to the cooperative. [*Farmers Cooperative Co.* v. *Birmingham*, 86 F. Supp. 201, 213, 214 (N.D. Iowa 1949).]

See also *Clover Farm Stores Corporation*, 17 T.C. 1265, 1277 (1952); *Puget Sound Plywood, Inc.*, 44 T.C. 305 (1965); *United States* v. *Mississippi Chemical Co.*, 326 F. 2d 569, 571 (C.A. 5, 1964).

It was generally thought that legislation enacted in 1951 would insure that the earnings of cooperatives would be currently taxable (to the extent they reflected business activity) either to the cooperatives or their patrons. See H. Rept. No. 1447, 87th Cong., 2d Sess., 1962–3 C.B. 405, 482; and S. Rept. No. 1881, 87th Cong., 2d Sess., 1962–3 C.B. 707, 817. This legislation, together with prior Treasury rulings, recognized the practice that patronage dividends, refunds, and rebates to patrons with respect to their patronage would be taken into account in computing net taxable income of both exempt and nonexempt cooperative organizations. See *Farmers Cooperative Co.* v. *Commissioner*, 288 F. 2d 315, 317 (C.A. 8, 1961), reversing 33 T.C. 266 (1959). The exclusions permitted the cooperatives were "based upon the assumption that the dividends so distributed would be taxable to the patron." *Farmers Cooperative Co.* v. *Commissioner*, *supra* at 319. However, since many of the cooperatives distributed their annual net income in the form of noncash patronage dividends and retained the actual earnings for the use of the cooperatives, the validity of the assumption that the patrons would be taxable on the dividends was upset by several Courts of Appeal. See *Long Poultry Farms* v.

*Commissioner*, 249 F. 2d 726 (C.A. 4, 1957), reversing 27 T.C. 985 (1957); *Commissioner* v. *Carpenter*, 219 F. 2d 635 (C.A. 5, 1955), affirming 20 T.C. 603 (1953); *Caswell's Estate* v. *Commissioner*, 211 F. 2d 693 (C.A. 9, 1954), reversing 17 T.C. 1190 (1952); *Moe* v. *Earle*, 226 F. 2d 583 (C.A. 9, 1955).

These decisions, dealing with both cash basis and accrual basis taxpayers and exempt cooperatives,[5] in essence held that since the noncash patronage dividends were subject to numerous restrictions, the patrons' right to receive the income the dividends represented never became fixed and the patrons were under no obligation to return the noncash dividends as income. See, for example, *Long Poultry Farms* v. *Commissioner, supra* at 730.

The aforementioned decisions left Congress with the dilemma of cooperatives deducting the gain attributable to patrons' business activity as patronage dividends while those same patrons refused to include the gain in income. Congress' answer was the enactment of subchapter T (sections 1381–1388) of the 1954 Code, which provided for a statutory formula to insure that the income generated through the use of a cooperative would be taxable to either the cooperative or the patron. Subchapter T, so far as it is applicable to the case at bar, provides that a cooperative is not required to take income represented by the distribution of qualified per-unit retain certificates into account in determining taxable income. However, this deduction is premised on the consent of the patron to include in his income at their face amount the qualified allocations distributed by the cooperative. It is this voluntary consent of the patron which Congress in enacting subchapter T believed to be sufficient to establish the necessary elements to tax the patron on the noncash distributions.

Your committee believed that, since in the case of * * * the * * * consent allocation the patrons have constructively received the dividend and reinvested it, it is clear (where the patronage dividend arises from business activity) that it constitutes income to the patron and is properly taxable to him. [H.Rept. No. 1447, *supra*, 1962–3 C.B. 483.]

Petitioner in the case at bar, by its own volitional action, has consented to include noncash dividends in income and subjected itself to subchapter T, specifically section 1385(a)(3). What petitioner now asks us to do is vitiate the effects of that section by the heroic remedy of declaring the statute unconstitutional, see *Cohan* v. *Commissioner*, 39 F. 2d 540 (C.A. 2, 1930), and return the law of taxation of cooperatives and their patrons to the unset-

---

[5] The distinction between exempt and nonexempt cooperatives is of no importance upon the issue concerned herein. See, for example, *Farmers Cooperative Co.* v. *Commissioner*, 288 F. 2d 315 (C.A. 8, 1961), reversing 33 T.C. 266 (1959).

tled state as it existed prior to 1962.[6] Petitioner's main contention is that the noncash distributions it received are not income to it, and Congress in taxing it on such has exceeded the powers granted to it under the 16th amendment.[7]

Under the 16th amendment Congress has the "power to lay and collect taxes on incomes, from whatever source derived, without apportionment." Petitioner's argument requires a showing that Congress has attempted to tax something which does not constitute income within the meaning of the 16th amendment. See *Estate of Leonard E. Whitlock*, 59 T.C. 490, 506 (1972). It has failed to show such.

In the case at bar there are undeniable accessions to wealth, clearly realized, which petitioner benefits from and which it has consented to return as income. In situations where there is indeed income subject to tax it cannot be denied that Congress under the 16th amendment has the power to designate by "statutory formula" the proper party to return such income. See *Daisy M. Twinam*, 22 T.C. 83, 89 (1954).

In the cooperative area Congress by statutory formula has provided that a consenting member-patron is the proper party to report income generated through use of the cooperative on the theory that the patron has constructively received the income in question. "The Courts have * * * accepted constructive receipt of income as an appropriate basis for taxation in numerous areas of the tax law," *Garlock Inc.*, 58 T.C. 423 (1972), on appeal (C.A. 2, Aug. 31, 1972), and it is clearly established that income may be constructively received even though its actual receipt is waived by the taxpayer. See, for example, *Ruprecht* v. *Commissioner*, 39 F. 2d 458 (C.A. 5, 1930), affirming 16 B.T.A. 919 (1929).

In a variety of circumstances it has been held that the fact that the [actual] distribution of income is prevented by * * * *agreement* among private parties is no bar to its taxability. [*Eder* v. *Commissioner*, 138 F. 2d 27, 28 (C.A. 2, 1943), remanding 47 B.T.A. 235 (1942). Emphasis added.]

In the present case petitioner has consented that there was income for which it held the ultimate tax liability. The retain certificates which it now holds represent a reinvestment of that income.

---

[6] The treatment of qualified per-unit retain certificates, the particular type of allocations in the case at bar, was not actually clarified until Apr. 30, 1966, by a recent amendment (Pub. L. 89–809) to subch. T. However, it is clear from the committee reports accompanying that amendment that the treatment of per-unit retain allocations was to be in a manner "substantially parallel" to the treatment of patronage dividends. See S. Rept. No. 1707, 89th Cong., 2d Sess., p. 69.

[7] Petitioner has directed its argument to the abridgment of rights under the 16th amendment and we shall direct ourselves to this argument. However, it is elementary that the source of the taxing power is art. I, sec. 8, of the Constitution and not the 16th amendment. See *Penn Mutual Indemnity Co.*, 32 T.C. 653 (1959), affd. 277 F. 2d 16 (C.A. 3, 1960).

That reinvestment offers petitioner a substantial bundle of rights, and Congress is well within the limitations of the 16th amendment in holding petitioner responsible for taxation on the income in question.[8]

The fact that there is case law prior to the enactment of subchapter T which holds that noncash patronage dividends are not includable in the patron's income in the year of receipt is no bar to our holding in the present case. The courts in those cases were not faced with member-patrons who had consented to include noncash distributions as income, nor did those courts purport to be deciding a constitutional question, but only a question of the interpretation of the income tax laws then in effect.[9] Indeed, in the *Long Poultry Farms* case (249 F. 2d at 731), the court made note of the absence of a specific statute governing the taxability of the patrons.

The answer is that Congress while granting the right to the deduction by the cooperative left the matter of taxing the dividends to the recipients to be dealt with by existing law, making no change whatever with regard thereto * * *

Prior to the enactment of sections 22(k) and 23(u) (precursors to sections 71 and 215) in the Revenue Act of 1942, the Supreme Court had determined that alimony was not income to the wife but was paid in discharge of the general obligation to support, which was made specific by the divorce decree. See *Gould* v. *Gould*, 245 U.S. 151 (1917); *Douglas* v. *Willcuts*, 296 U.S. 1 (1935). Section 22(k) of the Revenue Act of 1942 which provided for the taxation of alimony as income to the wife was challenged on constitutional grounds. Relying mainly on the prior case law which held alimony not to be income the challengers mounted a 16th amendment attack on the validity of section 22(k). See *Mahana* v. *United States*, 88 F. Supp. 285 (Ct. Cl. 1950), certiorari denied 339 U.S. 978 (1950); *Fairbanks* v. *Commissioner*, 191 F. 2d 680 (C.A. 9, 1951), affirming 15 T.C. 62 (1950), certiorari denied 343 U.S. 915 (1952); *Daisy M. Twinam, supra.*

---

[8] In a slightly different context, this Court in two recent cases involving a constitutional question under the 16th amendment has accepted the principle of taxing at the shareholder level undistributed current corporate income. See *Estate of Leonard E. Whitlock*, 59 T.C. 490 (1972); *Garlock Inc.*, 58 T.C. 423 (1972), on appeal (C.A. 2, Aug. 31, 1972).

[9] Some of the courts which addressed themselves to the proper tax consequences of patrons receiving noncash distributions prior to the enactment of subch. T relied essentially on *North American Oil* v. *Burnet*, 286 U.S. 417 (1932), in determining that the patrons were not to be taxed in the year of receipt on these noncash distributions. It has been pointed out by this Court and others that "the focus of the *North American Oil* case was on the narrow question of *when* income is reportable," *Dri-Powr Distributors Association Trust*, 54 T.C. 460, 473 (1970), not on whether there was income within the context of the 16th amendment.

In upholding the constitutionality of section 22(k), none of the preceding courts felt constrained by the prior case law. All of the courts recognized that the prior case law had not precluded alimony from being income within the meaning of the 16th amendment but only that those cases determined the status of alimony within the then applicable revenue act. A similar situation exists today in the case at bar, and as in the *Twinam* case we once again feel free to limit the applicability of prior case law in light of subsequent specific statutory action.

Although a statute may impose a tax which is on "income" within the meaning of the 16th amendment, it must meet the challenge of other provisions of the Constitution. In particular petitioner in the case at bar contends that the statute in question is subject to judicial nullification because of the limitations of the 5th amendment.

Of course, the due process clause of the 5th amendment is applicable to Federal tax statutes, see *Heiner* v. *Donnan*, 285 U.S. 312 (1932); *Steward Machine Co.* v. *Davis*, 301 U.S. 548 (1937). However, as evidenced by the unsettled state of the law prior to 1962, a statutory solution was required and "Congress may adopt a measure reasonably calculated to prevent avoidance of a tax. The test of validity in respect of due process of law is whether the means adopted are appropriate to the end." *Helvering* v. *City Bank Co.*, 296 U.S. 85, 90 (1935). The measure adopted by Congress is quite appropriate.

An oft-repeated standard which must be met in order to insure due process is found in *Burnet* v. *Wells*, 289 U.S. 670 (1933):

To overcome [the] statute the taxpayer must show that in attributing to him the ownership of [this] income * * * or something fairly to be dealt with as equivalent to ownership, the lawmakers have done a wholly arbitrary thing, have found equivalence where there was none nor anything approaching it, and laid a burden unrelated to privilege or benefit. [*Burnet* v. *Wells, supra* at 679.]

We fail to see how petitioner, who has consented to the constructive receipt of income which was reinvested, can assert that the tax in question fails to meet the above standard, especially when it has consented to the inclusion of income; and furthermore its patron status, coupled with the per-unit retain certificates, carries not only the potential right of the return of petitioner's reinvested dividend but also the attendant benefits of expense-free services and possible preferential treatment for petitioner's products.

Moreover, even if there were any doubts about the constitutionality of the legislation [of which there are none] such doubts would have to be resolved in favor of validity of the statute in view of the presumption of constitutionality of an act of Congress, which is particularly strong in the case of a revenue measure. [*Michael P. Nammack*, 56 T.C. 1379, 1385 (1971), affirmed per curiam 459 F. 2d 1045 (C.A. 2, 1972), certiorari denied 409 U.S. 991 (1972).]

Petitioner's references to assignment of income cases such as *Lucas* v. *Earl*, 281 U.S. 111 (1930), and *Helvering* v. *Horst*, 311 U.S. 112 (1940), in an attempt to claim that Plymouth cannot assign income to petitioner which Plymouth is responsible for are misplaced. Unlike those cases, petitioner in the present case is a very definite factor in creating the income in question. Here, there is no attempt at all to attribute fruit "to a different tree from that on which [it] grew." *Lucas* v. *Earl*, *supra* at 115.

Petitioner argues, in the alternative, that if the taxable income which was generated by the use of the cooperative is not taxable to the cooperative, it is instead taxable to the growers. Petitioner contends that it was a mere conduit between the cooperative and the growers and therefore is not the proper party to assume the tax liability for such income. Though the informal nature of petitioner's business with the growers lends minor credence to petitioner's position, we think on the whole its point is not well taken.

Ordinarily the payment of money as the result of a business transaction to one person who may under some reasonable circumstances be entitled to it, is of itself affirmative evidence that he has received income. * * *

When such a person seeks to show that the receipt of money in respect of such transaction represents income to another rather than to himself * * * he is under the burden of proving the nature of the transaction and that the payments really belong to others, rather than to himself. [*Commissioner* v. *Smith*, 285 F. 2d 91, 97 (C.A. 5, 1960), affirming a Memorandum Opinion of this Court.]

Petitioner clearly has not met this burden. Petitioner, not petitioner's grower-clients, is the stockholder in Plymouth. Any benefits which result from the member-patron status flow directly to petitioner. One of the services offered by petitioner to the growers is petitioner's ability to market the growers' goods. Petitioner, because of its member-patron status, has ready access to a facility which enables it to advantageously fulfill its marketing function as to fruit unsuitable for packing. As far as this Court can glean from the record, it is petitioner, because of its ownership of the certificates, and not the growers, who is entitled to the benefit of having 100,000 boxes of fruit processed by the cooperative free of any processing charge. Furthermore, when and if payments are made in redemption of the per-unit retain certificates, Plymouth will make the redemption payments to petitioner. To claim that one is merely a conduit while at the same time enjoying all of the fruits of the involved transaction is anomalous.

This Court on numerous occasions has found a taxpayer not taxable on income which he held only in his position as a conduit. However, all of the factual situations on those occasions provide a more concrete basis for finding the existence of a conduit relationship.

In the case at bar, the growers, petitioner's alleged principals, had no notification either written or oral of the alleged agency-type relationship. In most instances, the growers had no notice whatsoever of the very existence of the per-unit retain certificates. This almost total lack of knowledge is quite unlike the knowledge and understanding on both parties' parts which existed in cases such as *Seven-Up Co.*, *supra; Dri-Powr Distributors Association Trust*, 54 T.C. 460 (1970); *Broadcast Measurement Bureau, Inc.*, 16 T.C. 988, 997 (1951). Cf. *Harry Sherin*, 13 T.C. 221 (1949); *All Americas Trading Corporation*, 29 T.C. 908, 912 (1958). A purported agency relationship in which a purported principal knows nothing of the transaction out of which the alleged agency grows is indeed suspect. See C.J.S., Agency sec. 37, fn. 65.

Furthermore, there was no written contractual restriction on petitioner's use of the certificates and very little other evidence of any obligations regarding these certificates on the part of petitioner. Petitioner's directors never formally recognized any obligation to the growers. See *Broadcast Measurement Bureau, Inc.*, *supra*. Cf. *Krim-Ko Corporation*, 16 T.C. 31 (1951); *Compton Bennett*, 23 T.C. 1073, 1078 (1955).

Finally, it is important to note that petitioner alone dealt with Plymouth, and Plymouth's obligations ran only to Riverfront, its member-patron. To a great extent it was petitioner's efforts which were responsible for the success of the business endeavor. In fact, once the goods left the growers, at least for liability purposes, they belonged to petitioner. Cf. *Clover Farm Stores Corporation*, *supra; Compton Bennett*, *supra; All Americas Trading Corporation*, *supra*.

Petitioner's reliance on *Producers Gin Association, A.A.L.*, 33 T.C. 608 (1959), is misplaced. In that case we held that a cooperative was entitled to a patronage dividend paid exclusion when we found that rebates made by the cooperative were true patronage dividends which were returned to the party whose patronage created the particular type of profit distributed to him. The distributions were made for the most part to the true patron's landlord and not directly to the patron-tenant. The Court, in allowing the exclusion, found that the landlord, in receiving the distributions, was acting only as an agent for the real patron-tenants. In finding that an agency relationship did exist between the landlord and the patron-tenants, the Court noted the following facts: (1) The landlord both under the contract with the cotton ginning cooperative and in his acts at all times represented and declared himself as agent for his tenants; (2) at each step in the operation the ownership of the cotton was declared; and (3) in some instances the tenant-patrons picked up their patronage rebates them-

selves. No similar facts exist in the case at bar upon which to find a similar relationship between petitioner and its grower-customers.

Reviewed by the Court.

*Decision will be entered for the respondent.*