*Decisions will be entered under Rule 50.*

GARLOCK INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 1185–69.    Filed June 5, 1972.

*Winthrop R. Munyan* and *Robert D. Whoriskey*, for the petitioner.
*Agatha L. Vorsanger*, for the respondent.

QUEALY, *Judge:* The respondent determined deficiencies in the Federal income tax of the petitioner as follows:

| Year ended | Deficiency |
| --- | --- |
| Dec. 27, 1964 | $93,335.83 |
| Dec. 26, 1965 | 27,061.49 |

Con*e*essions having been made, the issues presented for decision are:

(1) Whether Garlock, S.A., a Panamanian corporation, was a controlled foreign corporation within the meaning of section 957(a) of the Internal Revenue Code of 1954,[1] as amended;

(2) Whether section 951 of the Internal Revenue Code of 1954, as amended, is unconstitutional.

FINDINGS OF FACT

Some of the facts have been stipulated. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference.

Garlock Inc. (hereinafter referred to as the petitioner) is a corporation which was organized under the laws of New York in 1905. At the time of the filing of the petition herein in March 1969 and at all times pertinent hereto, the principal office of the petitioner was in Palmyra, N.Y.

During all periods involved herein, the petitioner was on the accrual basis of accounting. Petitioner filed its corporate income tax returns (Forms 1120) for the taxable year ended December 27, 1964, and December 26, 1965, respectively, with the district director of internal revenue at Buffalo, N.Y.

During the years 1964 and 1965, the petitioner was engaged in the business of manufacturing and selling industrial components such as gaskets, packings, and seals. The petitioner had one class of authorized common stock (2,500,000 shares of $1 par value each) of which 900,000 shares were issued and outstanding during 1964 and 1965. As of December 27, 1964, these 900,000 shares were held by 3,179 shareholders; and as of December 26, 1965, they were held by 3,731 shareholders. All such outstanding shares were publicly traded on the New York Stock Exchange beginning on May 25, 1964.

Garlock, S.A., is a corporation which was organized under the General Corporation Law of the Republic of Panama on April 8, 1958. Garlock, S.A., had $50,000 of paid-in capital in 1958. Garlock, S.A., was a marketing operation organized to market in Europe and Asia the products manufactured by the petitioner and its affiliates. During all periods herein, Garlock, S.A. (hereinafter referred to as S.A.), was on the accrual basis of accounting.

From the time of its organization and through December 27, 1962, S.A. had one class of common stock issued and outstanding, each share with a par value of $100. During this period, all such issued and outstanding stock was owned by the petitioner.

Following the organization of S.A. in 1958, Donald J. Camille (here-

---

[1] All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.

inafter referred to as Camille) became its president and treasurer. He continued in those offices from the time of his appointment in 1958 through 1965. Camille was also the export manager of the petitioner during this period.

At a meeting of the board of directors of the petitioner held on December 4, 1962, A. J. McMullen, president of the petitioner, submitted a written report, dated December 4, 1962, which proposed a recapitalization of S.A. This report stated in part that:

Our subsidiary, Garlock, S.A., incorporated in Panama in 1958, has served as a holding company and as a selling organization for exports outside the Western Hemisphere. As of June 30, 1962, it had accumulated earnings and capital gains of $400,000 which will not be subject to United States income taxes unless and until they are returned to Garlock Inc. as dividends. It has been our intention to use such untaxed earnings and gains to finance the purchase of the French, Swiss and Italian operations now being negotiated.

The Revenue Act of 1962 contains provisions under which earnings after January 1, 1963 would be taxed currently by the United States whether or not repatriated as dividends. Furthermore, some of the earnings of Garlock, S.A.'s own subsidiaries to be acquired—French, Swiss and Italian, will likewise be taxed whether or not paid as dividends. The above tax liability would result from the Revenue Act's definition of a "controlled foreign corporation".

To avoid this tax result it will be necessary to change the capital stock structure and voting rights in such a way that Garlock, S.A. will no longer be a "controlled foreign corporation" as defined in the Revenue Act.

On the advice of our special tax counsel (Curtis, Mallet-Prevost, Colt & Mosle), we proposed, with Board approval, to pass 50% of the voting rights to foreigners who will not have any interest in exercising their vote independently of our 50%. The following steps are recommended:

1. Garlock, S.A. will reorganize its capital structure so that it will have a common stock investment of $100,000.

2. Garlock, S.A. will create a new issue, of $100,000 Callable Preferred Stock carrying voting power equal to the common stock.

3. Garlock, S.A. will place this stock with foreign investors who understand our motives and are willing to vote their stock with us in return for an ample dividend rate—probably 8%.

4. Garlock Inc. can be protected from loss of actual control by the following provisions in the preferred stock:

    a. Stock callable at any time.

    b. Preferred stock transferrable [sic] only with consent of Garlock, S.A.

All of the above is permissible under Panamanian laws.

We have approached two foreign investors who understand the situation and we believe one or both of them will invest in the new preferred stock when issued. The two investors are:

      Willard International Financial Company Limited
      Nassau, Bahamas
      Rinderknecht & Co., AG.
      Zurich, Switzerland

If the Preferred Stock is so sold, the proceeds will be useful in the purchase and expansion of Chromex, S.A. The dividend cost of 8% compares with 6½% or 7% which Chromex would have to pay on foreign bank loans for the same purpose.

It is recommended that this Board endorse in principle the above plan so that Garlock, S.A. may be authorized in a stockholders' meeting to proceed accordingly.

The proposed plan of recapitalization was discussed and approved by the board of directors at the meeting of December 4, 1962, subject to the approval of the plan by counsel. With respect to such plan, the minutes of that meeting state in relevant part that:

The President submitted a written report dated December 4 proposing a recapitalization of the Company's wholly-owned subsidiary, Garlock, S.A. whereby the common stock would be increased from $50,000 to $100,000 and a new issue of $100,000 of 8% redeemable preferred stock be issued with voting rights equal to the common stock. Further, it was proposed that the preferred stock be placed with selected foreign investors who could be relied upon to vote their stock with the common. Upon motion duly made, seconded and unanimously carried the management was authorized to vote the corporation's stock in Garlock, S.A. to accomplish the above objectives when and as approved by counsel.

At a special stockholders meeting held on December 26, 1962, the directors and stockholders of S.A. voted to amend the certificate of incorporation of S.A. to provide, insofar as relevant to this proceeding, that the authorized capital of the corporation be divided into two classes of stock consisting of 1,000 shares of preferred stock with a par value of $100 each, and 1,500 shares of common stock with a par value of $100 each. The preferred stock was given equal voting rights with the common, i.e., one vote for each share of stock, but it was provided with a preference to receive a fixed annual cumulative dividend at 8 percent. At the time of dissolution or liquidation, the preferred stock was given a preference to receive an amount not exceeding its par value. Furthermore, stockholders were given the right to vote in person or by proxy. These amendments were permitted by Panamanian law and were made in accordance with the requirements of the law of that country, and they were duly filed in Panama.

At the time of this special meeting of the S.A. stockholders, the officers of the corporation were Camille, president and treasurer; J. E. Brennan, vice president; J. D. Lynn, secretary; and J. R. Alsdorf, assistant secretary. The directors of S.A. at this time were Camille, McMullen, J. B. Sewell, and William Sheffeld. In addition to holding the above offices and directorships in S.A. at the time of the special meeting, Camille was export manager for the petitioner, and J. D. Lynn was assistant secretary and tax officer of the petitioner. J. R. Alsdorf was the petitioner's secretary. McMullen was the president of the petitioner, and J. B. Sewell and William Sheffeld were vice presidents.

At the same special meeting of S.A.'s stockholders on December 26, 1962, S.A.'s articles of incorporation were amended with respect to the term of the board of directors. Prior to December 26, 1962, the arti-

cles provided for the election of directors by majority vote of the stockholders for a term of 1 year, to hold office until their respective successors were elected and qualified. At the special meeting of December 26, 1962, S.A.'s articles of incorporation were amended to provide for the election of directors by majority vote of the stockholders for terms of from 1 to 5 years, the exact term to depend upon the vote at the time of the respective election. The provisions concerning the *terms* of directors both before and after the amendment were in accordance with Panamanian law which provides that the directors of a Panamanian corporation shall be chosen in the manner provided for in the articles of incorporation.

The number of directors of S.A. was at all times fixed in the articles of incorporation of S.A. at not more than nine and not less than three. Prior to 1963, the exact number of directors of S.A. was fixed under article 7 of the bylaws of S.A. at four directors. This provision was in accordance with Panamanian law, which permits the number of directors to be fixed by the bylaws of the corporation. At the special meeting of S.A.'s stockholders on December 26, 1962, the following four directors were elected to serve for a term of 5 years or until their successors were elected and qualified: Messrs. J. R. Alsdorf, Camille, A. J. McMullen, and J. B. Sewell.

Willard International Financial Co., Ltd. (hereinafter referred to as Willard), a Bahamian corporation, was a dealer in non-U.S. investments, selling to non-U.S. investors. Charles W. B. Wardell, Jr. (hereinafter referred to as Wardell), was president and a director of Willard during the period of 1962 through 1965. Canadian Camdex Investments, Ltd. (hereinafter referred to as Camdex), a Canadian corporation, was a wholly owned subsidiary of Willard. Wardell was also an officer of this Canadian corporation.

Wardell became familiar with S.A. through Winthrop Munyan (hereinafter referred to as Munyan), a member of the law firm of Curtis, Mallet-Prevost, Colt & Mosle, who was counsel to Willard and Camdex and special tax counsel to the petitioner. In November 1962, Wardell discussed with Alsdorf, the secretary of the petitioner and the assistant secretary and a director of S.A., the proposed sale of the preferred stock of S.A., and the possible placement of such stock with foreign investors. Wardell also discussed with Munyan and Alsdorf the effects of the Revenue Act of 1962 on the possible placement abroad of the the new issue of S.A.'s new preferred stock. He did not, however, discuss the Revenue Act of 1962 with any of the foreign investors who eventually purchased shares of the S.A. voting preferred stock. During the initial discussions in December 1962 concerning the issuance and the placing of the voting preferred stock with various foreign institutional investors, the contemplated

issue of voting preferred stock was at all times referred to as debt by both S.A. and Wardell.

John J. Grady was manager of the petitioner's finance division during the second half of 1962 and the vice president of finance for the petitioner in 1964 and 1965. He was involved in the planning and implementation of the stock sale, and he indicated that the preferred stock was issued "to avoid the impact of the Revenue Act of 1962." He also indicated that some other form of paper could have been issued. Camille was also a party to the planning and implementation of the stock sale. He also indicated that the Revenue Act of 1962 was an important element of that decision.

On December 4, 1962, the same day that McMullen submitted the written report concerning the recapitalization of S.A. to the board of directors of the petitioner, Alsdorf wrote to Wardell stating:

The way now seems to be clear for the sole stockholder of this company to authorize some capital changes which will make available preferred stock which your company may purchase as we have discussed.

Assuming that the plan works out and the mechanics can be handled, we will take the following steps:

1. Garlock, S.A. will reorganize its capital structure so that it will have common stock outstanding of $100,000 par value. The additional $50,000 of that now outstanding will probably be issued as a 100% stock dividend, capitalizing $50,000 of earned surplus.

2. Garlock, S.A. will amend its charter to create a new issue $100,000 par callable preferred stock carrying voting power equal to the common stock. Dividend rate will be 8% per annum payable quarterly.

3. Among other provisions which are of less importance to an investor, the preferred stock would have the following features:

    a. Callable at any time after ———, at a 3% premium.

    b. Preferred stock transferrable [sic] only with written consent of Garlock, S.A.

It is our hope to have the preferred stock available for purchase sometime between January 15 and January 30, 1963. Other details can be checked with you as we make preparations for the issue but I believe the above information will enable you to sound out potential foreign investors. It is our understanding, of course, that you will retain at least 10% of the issue for your own account.

I am writing Win Munyan to have his office begin the legal work and he might be able to supplement the above as to details not covered.

It was a pleasure to make your acquaintance and to be able to work with you in our mutual interest.

On December 6, 1962, Wardell responded to Alsdorf's letter of December 4, 1962, stating in reply that:

This will acknowledge your letter of December 4 advising that Garlock, S.A. has decided to make available preferred shares which our subsidiary company, Canadian Camdex Investments, Ltd., is interested in purchasing.

I see no problem with the conditions and the steps that you describe. I will be in communication with Win Munyan so that we can assist in getting these things done within your time requirements.

*I am planning to spend most of the next week in Nassau and will lay the groundwork there after another discussion with Win Munyan here so that the transaction can ultimately be consummated in a routine manner.*

*I also enjoyed our discussion of this business and am grateful for the opportunity of working this out with your company.*

As the result of subsequent discussions, the preferred stock eventually issued by S.A. did not include a callability provision or any absolute restrictions on transferability.

On December 27, 1962, Camdex delivered to S.A. a subscription agreement (hereinafter referred to as the subscription agreement) for 1,000 shares of the newly authorized 8-percent cumulative preferred stock of S.A. at a price of $100 per share or $100,000 in the aggregate. The subscription agreement was accepted by S.A. on December 28, 1962. The December 27, 1962, subscription agreement provided in pertinent part as follows:

The undersigned subscriber hereby subscribes for 1000 shares of the 8% cumulative voting preferred stock, par value of U.S. $100 each, of Garlock S.A., a Panama corporation, at par and will pay the full price of $100,000 against delivery of the shares.

The undersigned and Garlock S.A. understand and agree that the subscription to and ownership of the shares of stock by the undersigned subscriber are subject to the following terms and conditions which shall apply so long as the subscriber owns the shares, such terms and conditions to be binding on any successor or assign of the undersigned subcriber:

1. The shares shall be transferable only with the prior written consent of the Board of Directors of Garlock S.A., which consent will not be unreasonably withheld and any transfer by operation of law, by assignment, or otherwise without such consent will be void and shall convey no right in or ownership of the shares to the transferee.

2. In the event that on any corporate matter relating to the business or affairs of Garlock S.A. or to the rights, obligations, or ownership of the preferred stock there is a dispute among the shareholders or Garlock S.A. is unable to hold a stockholder meeting or at such a meeting no vote can be effected because of the action or failure thereof of any common or preferred shareholder, any such shareholder or Garlock S.A. may demand arbitration of the matter so unresolved, such arbitration to be conducted by one arbitrator chosen by the President for the time being of the International Chamber of Commerce and to be held in New York City in accordance with the rules of arbitration and conciliation of the International Chamber of Commerce. Any decision of the arbitrator shall be final and binding on all shareholders and on Garlock S.A.

3. Garlock S.A. shall maintain at all times a net current asset or working capital position of at least 200% of the total par value of the preferred stock from time to time outstanding. In the event such position is not maintained, any preferred shareholder may demand, on 30 days' written notice, that his shares shall be purchased at par and Garlock S.A. or its designees shall purchase such shares.

4. In the event that at any time after one year from issue, any preferred shareholder shall wish to sell his shares, he shall have the right on 120 days' written notice to Garlock S.A. to sell his shares at par to Garlock S.A. and Garlock S.A. or its designee shall purchase such shares at par.

5. Within 30 days of the end of each calendar quarter, Garlock S.A. shall furnish to all preferred shareholders a statement reflecting its position at the end of the preceding calendar quarter.

6. The undersigned is purchasing these shares for investment.

On January 29, 1963, S.A. issued 1,000 shares of its newly authorized 8-percent cumulative voting preferred stock to Camdex pursuant to the subscription agreement. S.A. received $100,000 from Willard for such preferred stock on January 30, 1963. Camdex assigned 350 shares of its S.A. preferred stock on February 26, 1963, to Nederlandse. On the same day, Camdex assigned 350 shares of its S.A. preferred stock to Bansco and Co., a nominee for Bank of Nova Scotia. On the same day, Camdex assigned 200 more shares of its S.A. preferred stock to American African Finance Corp. (hereinafter referred to as Finance), a corporation organized under the laws of French Somaliland.

As agreed, Camdex retained 100 shares or 10 percent of the preferred stock. On August 23, 1965, Camdex assigned its 100 shares to Butler's Bank Ltd. (hereinafter referred to as Butler's Bank), a Bahamian corporation. On September 2, 1965, a new certificate for the 100 S.A. preferred shares originally assigned by Camdex to Butler's Bank was issued to Beals & Co., the nominee of the First Bank of Boston International, the U.S. correspondent bank of Butler's Bank. The certificate originally issued to Butler's Bank was canceled. No other sales, assignments, or transfers of S.A. preferred stock occurred during the period ending December 31, 1965. Each of the holders of the S.A. preferred stock executed adherences to the subscription agreement.

At the time of the issuance of the preferred stock, the 8-percent dividend rate for that stock exceeded the interest rate prevailing in the foreign market at that time. When the prevailing rate increased, S.A. increased the rate in recognition "that the cost of money, especially our dollars, was increasing very substantially and we felt that we had to be competitive to attract investment funds from those shareholders."

During the course of his activities with respect to the S.A. preferred stock, Wardell never concluded any formal agreement by which the S.A. preferred stock would not be voted independently of the common stock of S.A.

John Abell (hereinafter referred to as Abell) was the managing director of the International Co. of Wood-Gundy of Canada, investment bankers during late 1962 and early 1963. Abell contacted the Bank of Nova Scotia which eventually purchased 350 shares of S.A. preferred stock on February 26, 1963. He was unaware of any other arrangement, agreement, or understanding, other than the subscription agreement, between S.A. and the preferred stockholders.

On October 1, 1963, the board of directors of S.A. voted to amend article 7 of S.A.'s bylaws to increase the number of directors from four to five. The increase of the number of directors in this manner was in accordance with Panamanian law, which permits directors to amend the bylaws of a Panamanian corporation unless otherwise provided in the articles of incorporation. At this same meeting, the four directors of S.A. resigned in such order and in such manner and elected successors in such order and such manner that at the end of the meeting the following five individuals had been elected as new directors: Camille, Alsdorf, McMullen, Wardell, and Abell. They were elected to serve for a term to end with the next following annual meeting of stockholders of S.A. or until their respective successors were elected and qualified. At the same meeting, the board of directors of S.A. voted to amend the bylaws in order to increase the number of directors of S.A. from four to five directors.

The formal steps in the process by which the five directors of S.A. were elected on October 1, 1963, to serve until the next annual stockholders meeting are described below. Two of the four directors serving at the beginning of the October 1, 1963, meeting, Sewell and Camille, submitted their resignations at the meeting. The resignation of each individual "as a director for a term of five years from 26 December 1962, was received and accepted" by the remaining directors. At the same meeting, the remaining directors (Alsdorf and McMullen) then elected Camille to succeed himself "for a term to end with the next annual meeting or until his successor is elected." Alsdorf then resigned his 5-year term and was elected as a director to succeed himself for a 1-year term in exactly the same manner as Camille. McMullen then resigned his 5-year term and was elected as a director to succeed himself for a 1-year term in exactly the same manner as Camille and Alsdorf. The three directors then in office (McMullen, Alsdorf, and Camille) thereupon voted at the same meeting to amend the bylaws in order to increase the board from four to five members. They then elected two new directors, Wardell and Abell, each "for a term to end with the next annual meeting of stockholders or until his successor is elected." Thus during 1964 and 1965, the directors of SA. were as follows:

| Directors | Other affiliations |
|---|---|
| Donald J. Camille | President of S.A., export manager of petitioner. |
| James R. Alsdorf | Assistant secretary of S.A., secretary and general counsel for petitioner. |
| A. J. McMullen | President and a director of petitioner. |
| Charles W. B. Wardell, Jr. | President, Willard International Financial Co., Ltd. |
| John N. Abell | President, Wood-Gundy & Co., Inc. |

The five directors named above were duly elected in accordance with article 14 of the S.A. articles of incorporation and article 16 of the S.A. bylaws. The election was also in accordance with Panamanian law, which provided that vacancies occurring on the board of directors of a Panamanian corporation could be filled by the vote of a majority of the directors in office at the time of such election, unless otherwise provided in the articles of incorporation or the bylaws of the corporation.

No meeting of the stockholders of S.A. was held in 1963. At the annual stockholders meeting held on April 1, 1964, the five directors elected at the S.A. directors meeting of October 1, 1963, were duly elected for a succeeding term of 1 year or until their respective successors were elected and qualified. They were reelected for identical terms at the annual stockholders meeting held on April 7, 1965. Thus, during 1964 and 1965, the directors of S.A. were elected to office for a term of 1 year or until their respective successors were elected and qualified.

During 1964 and 1965, S.A. sent advance notice of stockholder meetings to all its stockholders accompanied by proxies to be used by any stockholder who would not or could not attend a meeting. The preferred stockholders executed such proxies which were voted on their behalf at the 1964 and 1965 annual meetings. The proxies so executed appointed McMullen and/or Alsdorf to vote the stock subject to the proxy "on all matters, including the election of directors, which may come before the 1964 [or 1965] annual meeting of the stockholders."

In 1963, 1964, and 1965, S.A.'s net profit was $94,260.61, $173,382.60, and $50,171.20, respectively. During the same years, the holders of the preferred stock received so-called cumulative dividends of $8,000 per year.

#### OPINION

Section 951, which was enacted in 1962, provides that a U.S. shareholder of a "controlled foreign corporation" must include in income his (or its) pro rata share of the corporation's subpart F income (defined in section 952) whether or not it has been distributed to the shareholder. The parties have stipulated that all of S.A.'s income was subpart F income, and there is no question that the petitioner is a "United States shareholder" as defined in section 951(b). Consequently, the only issue for decision in this case is whether S.A. was a "controlled foreign corporation" during 1964 and 1965 within the meaning of section 957(a), which provides as follows:

(a) GENERAL RULE.—For purposes of this subpart, the term "controlled foreign corporation" means any foreign corporation of which more than 50

percent of the total combined voting power of all classes of stock entitled to vote is owned (within the meaning of section 958(a)), or is considered as owned by applying the rules of ownership of section 958(b), by United States shareholders on any day during the taxable year of such foreign corporation.

At the outset, petitioner argues that section 957(a) "imposes only a mechanical test of voting power through stock ownership," as distinguished from substantive control. In other words, petitioner contends that applying the statute literally it did not own stock having more than 50 percent of the voting power of all of the stock of S.A. Since the remainder of the stock was owned by other than U.S. shareholders, S.A. does not fall within the definition of a controlled foreign corporation.

In this respect, we cannot accept petitioner's argument. The concept that mechanical or formalistic compliance with the statute is sufficient has long been rejected by the courts. See, e.g., *Pinellas Ice Co.* v. *Commissioner*, 287 U.S. 462 (1933); *LeTulle* v. *Scofield*, 308 U.S. 415 (1940); and *Helvering* v. *Limestone Co.*, 315 U.S. 179 (1942).

The purpose of enacting subpart F is clear. With reference to the "tax haven device," a characterization aptly describing the role of S.A., the President's Recommendations on Tax Revision stated:[2]

On the other hand, I recommend elimination of the tax haven device anywhere in the world, even in the underdeveloped countries, through the elimination of tax deferral privileges for those forms of activities, such as trading, licensing, insurance, and others, that typically seek out tax haven methods of operation. There is no valid reason to permit their remaining untaxed regardless of the country in which they are located.

In enacting subpart F, the Congress intended to accomplish the stated objective. In its report accompanying the Revenue Act of 1962, the Ways and Means Committee stated:[3]

Your committee also has ended tax deferral for American shareholders in certain situations where the multiplicity of foreign tax systems has been taken advantage of by American-controlled businesses to siphon off sales profits from goods manufactured by related parties either in United States or abroad. In such cases the separation of the sales function is designed to avoid either U.S. tax or tax imposed by the foreign country.

The basic purpose of the 50-percent test in section 957(a) was clearly designed and intended to exclude from the definition of a "controlled foreign corporation" only those foreign corporations which were not subject to the dominion and control of U.S. shareholders. To enable or to allow U.S. taxpayers to overcome this basic statutory purpose through the issuance of stock certificates to accommodation buyers, without in substance relinquishing control of the foreign corporation, would frustrate the intent of the Congress.

---

[2] H. Doc. No. 140, President's Recommendations on Tax Revision, 87th Cong., 1st Sess. (1961).

[3] H. Rept. No. 1447, 87th Cong., 2d Sess. (1962), 1962-3 C.B. 462.

While we recognize the right of taxpayers to cast their plans in such manner as to minimize their tax liabilities, it is equally axiomatic that such plans must have substance in order to achieve the intended result. The incidence of taxation must depend on the substance of the transaction and not its form. *Commissioner* v. *Court Holding Co.*, 324 U.S. 331 (1945); *Higgins* v. *Smith*, 308 U.S. 473 (1940); and *Gregory* v. *Helvering*, 293 U.S. 465 (1935). As stated by the Supreme Court,in *Gregory* v. *Helvering*, *supra* at 469, "The legal right of a taxpayer to decrease the amount of what otherwise would be his taxes, or altogether avoid them, by means which the law permits, cannot be doubted. * * * But the question for determination is whether what was done, apart from the tax motive, was the thing which the statute intended."

The respondent thus properly has ruled that more than a formalistic transfer or issuance of voting stock without the surrender of substantive control is required in order to avoid being classified as a controlled foreign corporation within the meaning of section 957(a). Section 1.957–1(b)(2), Income Tax Regs., provides in part that "Any arrangement to shift formal voting power away from United States shareholders of a foreign corporation will not be given effect if in reality voting power is retained." Section 1.957–1(b)(2) further provides in part that:

The mere ownership of stock entitled to vote does not by itself mean that the shareholder owning such stock has the voting power of such stock for purposes of section 957. For example, if there is any agreement, whether express or implied, that any shareholder will not vote his stock or will vote it only in a specified manner, or that shareholders owning stock having not more than 50 percent of the total combined voting power will exercise voting power normally possessed by a majority of stockholders, then the nominal ownership of the voting power will be disregarded in determining which shareholders actually hold such voting power, and this determination will be made on the basis of such agreement. Moreover, where United States shareholders own shares of one or more classes of stock of a foreign corporation which has another class of stock outstanding, the voting power ostensibly provided such other class of stock will be deemed owned by any person or persons on whose behalf it is exercised or, if not exercised, will be disregarded if the percentage of voting power of such other class of stock is substantially greater than its proportionate share of the corporate earnings, if the facts indicate that the shareholders of such other class of stock do not exercise their voting rights independently or fail to exercise such voting rights, and if a principal purpose of the arrangement is to avoid the classification of such foreign corporation as a controlled foreign corporation under section 957.

The facts in this case bring it squarely within the regulations.

Prior to December 27, 1962, the petitioner owned 100 percent of the stock of S.A. The petitioner thereupon set about to reduce the voting power of this stock to 50 percent of the total combined voting power.

The plan for the sale of the preferred stock was described in a written report submitted by petitioner's president to its board of directors

on December 4, 1962. This plan was "to pass 50% of the voting rights to foreigners" who would "not have any interest in exercising their vote independently" of the petitioner's common stock and "who understand our motives" and are "willing to vote their stock with us [the petitioner] in return for an ample dividend rate—probably 8%." The report stated in essence that the creation of the new class of stock was necessary to avoid the provisions of the Revenue Act of 1962, and it is clear that this factor was the primary motivating factor behind the recapitalization. The report also recommended that the transferability of the new stock be restricted in order to prevent the "loss of actual control" by the petitioner.

On December 26, 1962, S.A.'s charter was amended at a special stockholders meeting to provide for 1,000 shares of preferred stock of $100 par value, having voting rights equal to those of the common stock.

On or about December 27, 1962, 1,000 shares of preferred stock of S.A. were issued to Camdex, a Canadian corporation, for $100,000. Camdex, acting as an underwriter, immediately resold 900 of the 1,000 shares to selected foreign corporations.

The preferred stock was subject to certain terms and conditions set forth in a subscription agreement as follows: (1) The preferred stock could not be transferred without the consent of S.A., such consent not to be unreasonably withheld; (2) S.A. was required to maintain a net current asset or working capital ratio of at least 200 percent of the total par value of the preferred stock, and if such position was not maintained, any preferred shareholder had the right to demand, on 30 days' notice, that his shares be purchased at par by S.A.; (3) at any time after the end of the first year following the issuance of the stock, any stockholder has the right on 120 days' written notice, to demand that S.A. purchase his shares at par; and (4) if any dispute arose with respect to the affairs of the corporation or the rights, obligations, or ownership of the preferred stock, or if S.A. was unable to hold a meeting because of the action or inaction of any stockholder, any stockholder could demand arbitration, and the decision of the arbitrator was final and binding on all the stockholders.

We thus have a situation where by the simple expedient of issuing a so-called preferred stock for a consideration of $100,000, paying 8 percent per annum, carrying with it ostensible voting rights equal to the common stock, S.A. sought to avoid being classified as a controlled foreign corporation as defined in section 957(a). It is clear that the principal purpose, if not the sole purpose, of the creation and issuance of the preferred stock was to avoid the impact of the controlled foreign corporation provisions of the Revenue Act of 1962. It is also clear that the percentage of voting power attributed the pre-

ferred stock was far greater than and substantially disproportionate to its share of the earnings. The preferred stock was entitled to only a very small percentage of the profits, i.e., 8 percent on the investment of $100,000. Finally, there was never any intent that the preferred shareholders would exercise voting rights independently of the common stockholders. On the contrary, as will be pointed out, nothing could be gained thereby.

In our opinion, the preferred stock should be disregarded in determining whether U.S. shareholders owned more than 50 percent of the voting power of S.A. To hold otherwise would require us to disregard completely the respondent's regulations. (Cf. sec. 1.1957–(b)(2), Income Tax Regs.) However, while the respondent's regulations provide criteria to determine whether the requisite control is present, our decision need not rest solely on the regulations.

Prior to the issuance of the preferred stock, S.A. admittedly was a "controlled foreign corporation" within the meaning of section 957(a). As sole stockholder, petitioner owned more than 50 percent of the combined voting power of all classes of stock entitled to vote. The real question is whether the petitioner effectively divested itself of such voting power or, conversely, whether the owners of the preferred stock acquired 50 percent of the voting power. On paper they did. In fact, they did not. After all of the elements of the plan had been implemented, there was in actuality no substantive change in the control of S.A.

On December 4, 1962, McMullen proposed to the petitioner's board of directors the recapitalization of S.A. through the issuance of preferred stock. McMullen proposed, with board approval, "to pass 50% of the voting rights to foreigners who will not have any interest in exercising their vote independently of our 50%" and to have S.A. "place this stock with foreign investors who understand our motives" (to avoid the effect of the Revenue Act of 1962) "and are willing to vote their stock with us in return for an ample dividend rate—probably 8%." The manipulation and selection of the S.A. board of directors which followed negative any intent on the part of the petitioner to relinquish the control represented by the common stock.

At a special stockholders meeting held on December 26, 1962, at which the articles of incorporation of S.A. were amended to provide for the creation of the new class of preferred stock, the stockholders (the petitioner) also voted to amend the articles to provide for a term of office for directors of S.A. of 1 to 5 years "depending on the vote at the time of the respective election by the majority vote at annual stockholders' meetings or any such stockholders' meetings called for that purpose." The bylaws of S.A. provided for a board of

four directors, and at the December 26, 1962, stockholders meeting, four officers of the petitioner were elected by the petitioner as the sole stockholder for 5-year terms or "until their successors have been elected and qualify."

At a special meeting of the S.A. board of directors held on October 1, 1963, the board of directors of S.A. amended the bylaws of S.A. to provide for a board of five directors. Two of the four directors (Sewell and Camille) then resigned. The remaining two directors (Alsdorf and McMullen) then elected Camille for a term to end with the next annual meeting or *until his successor was elected*. Alsdorf then resigned and was reelected by Camille and McMullen for the same term. McMullen then resigned and was reelected in the same manner and on the same basis. These three directors, all officers of the petitioner, then voted to amend the bylaws to provide for five directors instead of four. They then elected Wardell and Abell, who were presumably selected to represent the preferred stock, for a term to end with the next annual meeting or until their successors were elected.

Prior to the annual stockholders meeting held on April 1, 1964, the preferred stockholders executed proxies enabling McMullen and Alsdorf to vote their shares at the annual meeting. McMullen and Alsdorf elected the same individuals for a term of 1 year or until their successors were elected. This same process was repeated at the annual stockholders meeting held on April 7, 1965.

The respondent argues that the directors thus elected were by law entitled to serve for the unexpired 5-year term, if not removed by the majority vote of the stockholders. Therefore, respondent concludes petitioner had insured its control during the 5-year term. In support of this argument, respondent contends that the term of office of the directors, having been fixed by the stockholders, could not be reduced or enlarged by the board of directors. We find it unnecessary to resolve that issue. The board of directors was elected to serve until their successors were duly elected. In the event that the stockholders could not agree, the board would remain in office. Barring arbitration, there was no means whereby the preferred shareholders could, if they had wished to do so, challenge that control.

From the standpoint of the holders of the preferred stock, arbitration was not a viable solution to a deadlock. Their interest was limited to the repayment of their investment with accumulated dividends or interest. That much, they could demand at any time.[4] Rather than engage in a costly, if not futile, dispute with respect to control of S.A., the preferred shareholder need only demand repayment.

---

[4] During the years under consideration, the holders of the preferred stock could demand that S.A. repurchase their stock on 120 days' notice.

In our opinion, the actual control of S.A. at all times rested in the petitioner as owner of the common stock. That was the intention, and it was effectively carried out.

Finally, the petitioner argues that the tax imposed by section 951 is in violation of the Constitution of the United States. However, we have held that the petitioner, the sole American stockholder of S.A., did not in substance relinquish control of said corporation. Under these circumstances, section 951 taxes a proportionate share of the income of the corporation to the petitioner. There is no constitutional bar to such a tax. In *Eder* v. *Commissioner*, 138 F. 2d 27 (C.A. 2, 1943), the court upheld the constitutionality of the then applicable provisions concerning foreign personal holding companies, which, under the facts of that case, required the taxpayers to report as income the undistributed net income of their Colombian corporation. This was so even though, under Colombian law, they were unable to receive such income in the United States in excess of $1,000 per month.

Further, case law is replete with decisions holding that income paid to one entity may, under certain circumstances, be taxed as another's income.[5] The courts have also accepted constructive receipt of income as an appropriate basis for taxation in numerous areas of the tax law. See, e.g., *Heiner* v. *Mellon*, 304 U.S. 271 (1938) ; *Gregory* v. *Helvering*, *supra*.

Consequently, we find that the tax imposed on the petitioner by section 951 is not in violation of the Constitution of the United States.

Reviewed by the Court.

*Decision will be entered for the respondent.*

TANNENWALD, *J.*, concurring : I agree with the result reached by the majority herein solely on the ground that on all the facts, it seems clear to me that there was an agreement (albeit not a formal one) on the part of Camdex either not to vote the preferred shares it retained or to vote such shares in accordance with petitioner's wishes. On this basis (and without regard to whether there was such an agreement on the part of the other preferred shareholders), petitioner owned "more than 50 percent of the total combined voting power of all classes of stock entitled to vote" within the meaning of sections 957(a) and 958(a). The majority opinion is unclear as to the significance which it attaches to the fact that petitioner's representatives constituted a majority of the board of directors of S.A. during the taxable years

---

[5] See, e.g., *Helvering* v. *Nat. Grocery Co.*, 304 U.S. 282 (1938) ; *Burnet* v. *Wells*, 289 U.S. 670 (1933). See also *Corliss* v. *Bowers*, 281 U.S. 376, 378 (1930), wherein the Supreme Court stated : "But taxation is not so much concerned with the refinements of title as it is with actual command over the property taxed—the actual benefit for which the tax is paid."

involved. In my opinion, that fact represents nothing more than some evidence that there was such an agreement; it does not constitute an independent basis for concluding that the requisite control existed. Given the particular fact situation involved herein and the ultimate conclusion flowing therefrom, it remains for future decisions to determine whether the totality of section 1.957–1(b)(2) of respondent's regulations is a valid implementation of the statutory provisions.

DRENNEN, RAUM, FEATHERSTON, and STERRETT, JJ., agree with this concurring opinion.