T.C. Memo. 2001-112


UNITED STATES TAX COURT


ANDREW G. AND CECILIA M. VAJNA, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 5038-96.                    Filed May 10, 2001.


        <u>Held</u>:  Respondent's motion for leave to file
amended answer under Rule 41(a), Tax Court Rules of
Practice and Procedure, granted.


        <u>Ronald L. Blanc</u>, <u>James P. Joseph</u>, <u>Brad D. Brian</u>, <u>Michael R.
Doyen</u>, <u>Joseph S. Klapach</u>, <u>Ted W. Lieu</u>, and <u>Christopher S. Rizek</u>,

for petitioners.

        <u>David J. Mungo</u> and <u>Katherine H. Ankeny</u>, for respondent.

MEMORANDUM OPINION

NIMS, Judge:

Procedural Background

This matter is before the Court on respondent's Motion for Leave To File Amended Answer. Such motion was filed on October 3, 2000, and respondent's proposed amended answer was lodged as of the same date. On October 23, 2000, petitioners filed an opposition to respondent's motion. Thereafter, on November 15, 2000, a hearing was held to address respondent's motion and petitioners' objections. The Court requested posthearing briefing with respect to a particular issue raised by the contentions and exhibits presented. Accordingly, opening briefs were filed in December of 2000, and reply briefs were filed in January of 2001. It is on the basis of these aforementioned moving papers and subsequent submissions, written and oral, that we decide respondent's motion. Factual information drawn from such materials is accepted solely for the purpose of considering the pending motion, and recitations thereof set forth below do not constitute findings of fact in this case[1].

In the notice of deficiency issued to petitioners in December of 1995, respondent determined, among other things, that petitioners received subpart F income which was not reported on their returns for the taxable years 1988 and 1989. More

---

[1]Unless otherwise indicated, all section references are to sections of the Internal Revenue Code in effect at all relevant times hereunder. All Rule references are to the Tax Court Rules of Practice and Procedure.

specifically, as relevant to the instant proceeding, respondent adjusted petitioners' income to include 50 percent of alleged subpart F income received by Carolco Investments B.V. (CIBV), a Netherlands entity, on the grounds that CIBV was a controlled foreign corporation in which petitioners owned 50 percent of the stock. The remaining 50 percent was allocated to Mario F. Kassar, petitioner in a related case at docket No. 5195-96. This position was maintained in respondent's original answer.

Respondent now seeks in paragraph 7 of the amended answer to attribute to petitioners 100 percent of CIBV's purported subpart F income for 1989, with a corresponding increase in the deficiency and accuracy-related penalty due for that year. Respondent's alleged basis for doing so is the claim that on December 30, 1989, the 50 percent of CIBV shares formerly owned by Mr. Kassar was transferred to Trust-en Administratiekantoor Nestor B.V. (Nestor), another Netherlands corporation, which respondent avers was owned or controlled by petitioners.

At the hearing held on November 15, 2000, counsel for petitioners represented that his clients objected to respondent's proposed amended answer only with respect to the allegations set forth in paragraph 7 thereof. Hence, there is no barrier to our granting respondent's motion in so far as it relates to items other than those detailed in paragraph 7. As regards paragraph 7, we conclude, for the reasons explained below, that respondent's motion should be granted on this point as well.

Procedural Standard--Leave To Amend

Rule 41(a) provides in effect that after the pleadings are closed, "a party may amend a pleading only by leave of Court or by written consent of the adverse party, and leave shall be given freely when justice so requires."  Like rule 15(a) of the Federal Rules of Civil Procedure, from which it is derived, Rule 41(a) reflects "a liberal attitude toward amendment of pleadings."  60 T.C. 1089 (explanatory note accompanying promulgation of Rule 41).  The U.S. Supreme Court has interpreted the "freely given" language of the civil rule as follows:

> If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits.  In the absence of any apparent or declared reason--such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.--the leave sought should, as the rules require, be "freely given." * * * [Foman v. Davis, 371 U.S. 178, 182 (1962).]

Accordingly, leave to amend should typically be supported by the presence of a colorable position and the absence of undue prejudice.  We consider the substantive law and the factual circumstances underlying respondent's motion in light of the foregoing procedural standard.

Substantive Principles--Taxation of Subpart F Income

Section 951 sets forth the operative rules governing treatment of subpart F income and provides in pertinent part as follows:

> SEC. 951.   AMOUNTS INCLUDED IN GROSS INCOME OF UNITED STATES SHAREHOLDERS.
>
> (a) Amounts Included.--
>
> (1) In general.--If a foreign corporation is a controlled foreign corporation for an uninterrupted period of 30 days or more during any taxable year, every person who is a United States shareholder * * * of such corporation and who owns (within the meaning of section 958(a)) stock in such corporation on the last day, in such year, on which such corporation is a controlled foreign corporation shall include in his gross income, for his taxable year in which or with which such taxable year of the corporation ends--
>
> (A) the sum of--
>
> (i) his pro rata share * * * of the corporation's subpart F income for such year * * *

Section 957 then goes on to define a controlled foreign corporation (CFC) as a foreign corporation in which more than 50 percent of the total combined voting power or total value of stock is owned by United States shareholders on any day during the corporation's taxable year.

Hence, two issues relevant in determining petitioners' liability for taxes on income received by CIBV are:  (1) The ownership of CIBV for purposes of evaluating its status as a CFC in 1989; and (2) the ownership of CIBV for purposes of allocating

to such owners a pro rata share of subpart F income.  Section 958(a) gives the following guidance on the question of stock ownership:

> SEC. 958(a).  Direct and Indirect Ownership.--
>
> (1) General rule.--For purposes of this subpart * * *, stock owned means--
>
> (A) stock owned directly, and
>
> (B) stock owned with the application of paragraph (2).
>
> (2) Stock ownership through foreign entities.--For purposes of subparagraph (B) of paragraph (1), stock owned, directly or indirectly, by or for a foreign corporation, foreign partnership, or foreign trust or foreign estate * * * shall be considered as being owned proportionately by its shareholders, partners, or beneficiaries.  Stock considered to be owned by a person by reason of the application of the preceding sentence shall, for purposes of applying such sentence, be treated as actually owned by such person.

In addition, regulations promulgated under section 958 provide rules of application supplementing the statutory text:

> Amount of interest in foreign corporation, foreign partnership, foreign trust, or foreign estate.  The determination of a person's proportionate interest in a foreign corporation, foreign partnership, foreign trust, or foreign estate will be made on the basis of all the facts and circumstances in each case.  Generally, in determining a person's proportionate interest in a foreign corporation, the purpose for which the rules of section 958(a) and this section are being applied will be taken into account.  Thus, if the rules of section 958(a) are being applied to determine the amount of stock owned for purposes of section 951(a), a person's proportionate interest in a foreign corporation will generally be determined with reference to such person's interest in the income of such corporation.  If the rules of section 958(a) are being

applied to determine the amount of voting power owned for purposes of section * * * 957, a person's proportionate interest in a foreign corporation will generally be determined with reference to the amount of voting power in such corporation owned by such person. However, any arrangement which artificially decreases a United States person's proportionate interest will not be recognized. * * * [Sec. 1.958-1(c)(2), Income Tax Regs.]

Regulations under section 957 similarly state that in analyzing CFC status:

Any arrangement to shift formal voting power away from United States shareholders of a foreign corporation will not be given effect if in reality voting power is retained. The mere ownership of stock entitled to vote does not by itself mean that the shareholder owning such stock has the voting power of such stock for purposes of section 957. * * * [Sec. 1.957-1(b)(2), Income Tax Regs.]

Case law has likewise reiterated in dealing with CFC status questions that "mere technical compliance with section 957(a)" is insufficient to exclude taxpayers from its application and that the "50-percent test of section 957(a) was intended to exclude from the definition of controlled foreign corporations only those foreign corporations which are not subject to the dominion and control of the United States shareholders." Estate of Weiskopf v. Commissioner, 64 T.C. 78, 93 (1975), affd. without published opinion 538 F.2d 317 (2d Cir. 1976); see also Kraus v. Commissioner, 59 T.C. 681, 692 (1973), affd. 490 F.2d 898 (2d Cir. 1974); Garlock, Inc. v. Commissioner, 58 T.C. 423, 433 (1972), affd. 489 F.2d 197 (2d Cir. 1973).

Factual Circumstances

In light of the foregoing principles, we turn to the facts before us. From 1986 through most of 1989, shares of CIBV were distributed as follows (with intermediate controlled entities omitted for purposes of simplification):

Mario F. Kassar (a United States resident)    24.95 percent
Kassar Family Trust (a Jersey entity)         25.05 percent
Andrew G. Vajna (a United States resident)    24.95 percent
Mong Family Trust (a Hong Kong entity)        25.05 percent

(Mr. Mong Hin Yan was the father of petitioner Cecilia M. Vajna.)

CIBV, in turn, owned approximately 75 percent of Carolco Pictures, Inc. (CPI), a Delaware corporation involved in the business of international motion picture distribution.

Then, in late 1989, it was decided to effect a buyout transaction whereby Mr. Kassar and the Kassar Family Trust would obtain control of CPI. In preparation therefor, the CIBV shares controlled by Mr. Kassar and the Kassar Family Trust were transferred to Beheer-en Beleggingsmaatschappij Petina B.V. (Petina), a Netherlands corporation also controlled by Mr. Kassar and the Kassar Family Trust. As originally contemplated, the buyout was then to proceed as follows. On or before December 29, 1989, CIBV was to sell all of its CPI stock to Petina and third parties and was to receive in return monetary compensation (cash and notes) in excess of $100 million plus the 50 percent of CIBV

shares held by Petina (essentially a redemption).  After these transfers, Petina would control CPI and Mr. Vajna and the Mong Family Trust would own 100 percent of CIBV.

However, due to an alleged technicality of Dutch law that prevented CIBV from acquiring its own shares from Petina prior to the close of 1989, an amended sales agreement was entered as of December 29, 1989.  Pursuant to this revised arrangement and in lieu of transferring its CIBV stock to CIBV, Petina agreed to issue a nonrecourse promissory note to CIBV in the amount of $99,253,000 and to grant to CIBV an option to purchase the shares.  The option enabled CIBV to acquire the subject stock, once the aforementioned legal impediment was removed, in exchange for canceling the $99,253,000 note.  The amended sales arrangement additionally provided that Petina would transfer the CIBV shares to Nestor, subject to CIBV's option to purchase.  In return, Nestor would assume the $99,253,000 note obligation, relieving Petina of all further liability.  Both the transaction between CIBV and Petina and that between Petina and Nestor took place on December 30, 1989.

Consequently, as of December 30, 1989, Petina controlled CPI, and ownership of CIBV was divided among Mr. Vajna, the Mong Family Trust, and Nestor in the manner set out below:

Andrew G. Vajna      24.95 percent  (499 shares)
Mong Family Trust    25.05 percent  (501 shares)
Nestor               50 percent     (1000 shares)

The option was thereafter exercised and the redemption of CIBV shares from Nestor completed on December 20, 1990. Mr. Vajna then owned 49.9 percent of CIBV and the Mong Family Trust owned 50.1 percent.

Given this scenario, it has been respondent's position from the outset that, for purposes of subpart F, ownership of the Mong Family Trust and the Kassar Family Trust should be attributed to petitioners and to Mr. Kassar, respectively. Respondent's amended answer now seeks to attribute ownership of Nestor to petitioners as well. Respondent asserts that ownership of Nestor bears upon the status of CIBV as a CFC on and after December 30, 1989, and upon the proper allocation of CIBV's subpart F income. At the hearing held on November 15, 2000, counsel for petitioners strenuously objected that respondent was engaging in a "fishing expedition". During such proceeding, the principal evidence offered by respondent that purported to establish a link between Mr. Vajna and Nestor was two documents entitled "IRREVOCABLE PROXY AND POWER OF ATTORNEY". On December 30, 1989, the same date as the buyout was effected, Nestor executed these grants in favor of Mr. Vajna and the Mong Family Trust, respectively. In operative part, the documents read:

> The undersigned hereby irrevocably appoints and constitutes Mr. Andrew G. Vajna [or Bankers Trust International Services, Ltd., as trustee of the Mong Family Trust] as its proxy and attorney-in-fact to exercise, do, and perform any act, right, power, duty,

or obligation whatsoever that the undersigned now has or may in the future have the legal right, power, or capacity to do, exercise, or perform as holder of Four Hundred and Ninety Nine (499) [or Five Hundred and One (501) in the proxy to the Mong Family Trust] shares of the capital stock of Carolco Investments, B.V., a corporation organized under the laws of The Netherlands ("CIBV"), held by the undersigned, including voting said shares, granting or withholding consents, authorizations or demands with respect thereto, and any other action that may be taken by the record and beneficial owner thereof, with power of substitution and with full power to act for the undersigned in its name, place and stead, in the same manner, and to the same extent and effect, that the undersigned might if it were personally present and acting.

## Application of Rule 41 Standard in Light of Law and Facts

### A.  Presence of Colorable Position

On the basis of the foregoing, we make the following observations as regards the potential merit of respondent's position.  The disputed portion of respondent's amended answer aims to tax petitioners under subpart F on a greater percentage of the income received by CIBV.  Resolution of such issue, if it is allowed to be raised, will depend in significant part both on the status of CIBV as a section 957 CFC and on the ownership of CIBV for purposes of the section 951 income allocation rules. Respondent's revised allegations with respect to these two elements rest, first, on the claim that Nestor was record owner of 50 percent of CIBV shares after the buyout and, second, on the contention that Nestor's ownership should be attributed to petitioners in applying both section 957 and section 951(a).

Since the parties are in apparent consensus, and the evidence reflects, that 50 percent of CIBV stock was titled in Nestor after the buyout, we turn to whether there exists grounds for respondent's arguments concerning petitioners' deemed ownership.

Regulations indicate that voting power is the primary consideration in deciding ownership for purposes of CFC status. Hence, the linkage between Nestor and petitioners established by the above-quoted proxies lends support to respondent's claims regarding CIBV's CFC status on and after December 30, 1989.

With respect to section 951 attribution, the regulatory test focuses on ascertaining the extent of a party's interest in the income of the CFC.  The regulations further expressly provide that "any arrangement which artificially decreases a United States person's proportionate interest will not be recognized." Sec. 1.958-1(c)(2), Income Tax Regs.  Based on this standard, we must conclude that the proxies are likewise pertinent to, and potentially supportive of respondent's position on, the question of a proper section 951 allocation.  The regulations indicate that a person could in some circumstances be deemed to hold an interest in income that might, as a formal matter, have resided in someone else.

Here, if Mr. Vajna and the Mong Family Trust possessed 100 percent of the voting power in CIBV (directly or by proxy), and if it were decided that the Mong Family Trust must be equated

with petitioners, then Mr. Vajna was in a position to control or prevent any income distribution that would or could be made by CIBV. The Nestor arrangement might thus be construed to do no more than artificially or formally decrease petitioners' actual interest in CIBV's receipts.

Furthermore, the language of the proxies used to describe the rights granted to the proxy holder is extremely broad. The terms certainly encompass more than voting power and do not foreclose an interpretation that would include the right to income distributions. In this connection, we note that the broad, irrevocable, presently operative nature of these proxies renders unpersuasive petitioners' attempts to find an analog in the limited agency conveyed by a typical voting proxy or the prospective rights represented by a mere option.

Accordingly, we believe that there exists colorable support, particularly in the proxy documents, that renders respondent's position more than a "fishing expedition".

B. Absence of Undue Prejudice

We must next weigh the possible prejudice to petitioners that could be caused by even a potentially meritorious argument. Although we are sympathetic to petitioners' protests regarding the large increase in deficiency, we find these concerns to be mitigated by at least two principal factors: (1) The centrality of Nestor's role to a complete and accurate resolution of the

entire subpart F issue as it relates to CIBV, and (2) the closely proximate relationship of the new contentions to those raised in the original notice of deficiency and answer.

As to the first point listed, and particularly in light of the fact that Mr. Kassar is likely to contest the whipsaw allocation to him of 50 percent of CIBV's income, we fail to see how a fair and satisfactory outcome can be reached in these two related cases without addressing Nestor. As regards the second point, ownership of CIBV for purposes of determining both CFC status and section 951 attribution has been at issue from the earliest stages of this dispute. Hence, petitioners were already faced with needing to marshal evidence related to these ownership matters. Such circumstance, especially when coupled with the ample time remaining to prepare for trial, which is scheduled to begin October 22, 2001, and with the fact that respondent will bear the burden of proof as to the increased deficiency, deprives arguments of surprise or prejudicial delay of any overriding force. We therefore conclude that the interests of justice will be better served by permitting amendment and thereby being in a position to decide this case, and the related case of Mr. Kassar, consistently and on the merits of all relevant evidence.

Lastly, for the sake of completeness, we note that petitioners' computational arguments disregard possible

interpretations of the transactions involved, are premature, and cannot substitute for analysis of the underlying substantive issues.

To reflect the foregoing,

<u>An appropriate order will be issued granting respondent's motion for leave to file amended answer</u>.